# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | |
|---|---|
| **CONTINENTAL CASUALTY COMPANY** ) ) ) **Plaintiff,** ) ) ) -against- ) ) **PIGGLY WIGGLY ALABAMA** ) **DISTRIBUTING COMPANY, INC.** ) ) **Defendant.** ) | CIVIL ACTION NO. _____ |

## COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION

Continental Casualty Company ("Continental") files this Complaint for Declaratory Judgment and Rescission against Piggly Wiggly Alabama Distributing Company, Inc. ("Piggly Wiggly"). Continental respectfully alleges and avers upon information and belief as follows:

## PRELIMINARY STATEMENT

1. This is an action for declaratory relief pursuant to 28 U.S.C. §§ 2201, *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure, to determine an actual case or controversy between Continental and Piggly Wiggly regarding the parties' respective rights and obligations under Commercial Umbrella Policy No. L4030701697 issued by Continental to Piggly Wiggly for the period of August 1, 2011 to August 1, 2012 (the "Policy").[1]

---

[1] A true and correct copy of the Policy is attached hereto as Exhibit A.

2. Continental seeks a judgment declaring that the Policy is rescinded and is void *ab initio* under Alabama Code § 27-14-7 due to Piggly Wiggly's material misrepresentations, omissions and/or concealment of facts to Continental in the Policy application and the underwriting process.

3. Alternatively, Continental seeks a judgment declaring that it has no duty to indemnify or pay any insurance proceeds under the Policy in connection with an underlying claim brought by Carolyn Henley, as Administrator of the Estate of Robert W. Long, and Carolyn Rosche, as Administrator of the Estate of Debra Garza, concerning the deaths of Long and Garza (the "Long/Garza Claim") based on the application of the Policy's exclusion entitled "Expected or Intended Injury."

4. Prior to suit being filed against Piggly Wiggly, Continental settled the Long/Garza Claim pursuant to a funding agreement with Piggly Wiggly that entitles Continental to seek reimbursement of the amounts Continental paid on behalf of Piggly Wiggly in connection with the settlement.

5. Based upon rescission or the application of the "Expected or Intended Injury" exclusion, there is no coverage under the Policy in connection with the Long/Garza Claim, and Continental seeks reimbursement of the amounts it paid on behalf of Piggly Wiggly in connection with the settlement of the Long/Garza Claim.

## PARTIES

6. Continental is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business located in Chicago, Illinois.

7. Piggly Wiggly is a corporation organized and existing under the laws of the State of Alabama located in Bessemer, Alabama 35021.

## JURISDICTION AND VENUE

8. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship among the parties, and the amount in controversy exceeds the sum of $75,000, exclusive of interest, attorneys' fees and costs.

9. Venue is proper in the United States District Court for the Northern District, Southern Division of Alabama because the Policy was issued and delivered in this District and Division.

## BACKGROUND FACTS

**The Accident**

10. Upon information and belief, Jason Stewart ("Stewart") was an employee of Piggly Wiggly and the son of the former CEO of Piggly Wiggly, Dennis Stewart.

11. Upon information and belief, on June 27, 2012, Stewart appeared for work at Piggly Wiggly and was observed by co-workers as behaving erratically.

12. Upon information and belief, aware of Stewart's history of drug abuse, one employee commented that it was a "bad" day for Stewart and that he was "going backwards."

13. Upon information and belief, Stewart's co-worker expressed a concern to their supervisor that Piggly Wiggly should not allow Stewart to drive the company vehicle home from work.

14. Upon information and belief, despite these observations and concerns, Stewart was permitted to operate a 2011 Chevrolet Silverado truck owned by Piggly Wiggly home from work on June 27, 2012.

15. Upon information and belief, while Stewart was driving on Highway 411, other drivers reportedly observed him weaving across the center line of the road and driving erratically, causing some drivers to pull off the road to avoid being struck by Stewart's vehicle.

16. At approximately 5:45 p.m, Stewart struck head-on a Harley Davidson motorcycle ridden by Robert W. Long ("Long") and Debra Garza ("Garza").

17. Long and Garza were both killed as a result of the June 27, 2012 collision.

18. Upon information and belief, a search warrant for Stewart's vehicle was executed on July 2, 2012 and revealed a total of 56 pills in the center console.

**The Long/Garza Claim**

19. The Estates of Long and Garza asserted the Long/Garza Claim against Piggly Wiggly, asserting that Piggly Wiggly, Stewart and other Piggly Wiggly executives were liable under the Alabama Wrongful Death Act, and sought compensatory and punitive damages.

20. The Estates of Long and Garza threatened litigation against Piggly Wiggly, Stewart, his father, David Bullard (Human Resources Director of Piggly Wiggly) and Ted Deacon, R.N. (company nurse for Piggly Wiggly) under the Alabama Wrongful Death Act and alleged substantial damages, including punitive damages.

21. The Long/Garza claimants alleged that, prior to and at the time of his collision with Long and Garza, Stewart drove Piggly Wiggly's vehicle while under the influence of narcotics, drugs, and other substances, including Opiates, Benzodiazepines, Neurontin and Fentanyl to the point that his ability to operate the vehicle that struck Long and Garza was severely debilitated and impaired.

22. The Long/Garza claimants further alleged that Dennis Stewart, Bullard and Deacon knew that Stewart had a long-standing drug abuse problem, that Stewart was taking daily

prescription medications including Opiates, Benzodiazepines, Neurontin and Fentanyl, and that Stewart had been involved in numerous prior motor vehicle accidents and tested positive for drugs.

23. The Long/Garza claimants also alleged that at the time of the June 27, 2012 collision, Stewart was operating the vehicle while engaged in the regular course and scope of his employment with Piggly Wiggly and with Piggly Wiggly's permission.

**Piggly Wiggly's Knowledge Of Stewart's Drug Abuse**

24. Upon information and belief, and according to the Long/Garza claimants' allegations, shortly after being hired at Piggly Wiggly, in May 2009, Stewart had to seek medical attention for a work related case of poison oak and, while being treated, a drug screen was run by Brookwood Hospital ER showing "abnormal" positive results for Opiates and Benzodiazepines. Although these medical test results were included in Stewart's personnel file, Stewart maintained possession of the keys to Piggly Wiggly's vehicle.

25. Upon information and belief, and according to the Long/Garza claimants' allegations, Piggly Wiggly's company nurse, Deacon, knew and had documented on company records placed in Stewart's personnel records that Stewart was taking prescription medications including Opiates, Benzodiazepines, Neurontin and Fentanyl on a daily basis.

26. Upon information and belief, and according to the Long/Garza claimants' allegations, on various occasions and while Stewart was being allowed to drive a Piggly Wiggly vehicle that was issued to him, Deacon further performed numerous "in house" drug tests on Stewart that were "positive" for multiple drugs that impair the ability to drive.

27. Upon information and belief, and according to the Long/Garza claimants' allegations, Piggly Wiggly's occupational doctor and designated Medical Review Officer, Bruce

Romeo, M.D., was also kept informed of Stewart's chronic drug problem by Deacon following each of Stewart's various failed "in house" drug tests.

28. Upon information and belief, and according to the Long/Garza claimants' allegations, Piggly Wiggly's Human Resources Director, Bullard, was also aware that Stewart had a drug problem as noted numerous times by Deacon and by Dr. Romeo in Stewart's personnel file documents.

29. Upon information and belief, and according to the Long/Garza claimants' allegations, on August 26, 2010, Deacon administered a drug urine test to Stewart, which tested positive and confirmed high concentrations of Hydrocodone, Hydromorphone, and Xanax. As a result of this test, Dr. Romeo wrote a letter, included in Stewart's personnel file, stating that: "Jason Stewart's drug screen results . . . included an alprazolam (Xanax) urine level that exceeded the limit of measurement. It is concluded that he represents a safety risk in the operation of mobile equipment, including tractors, pick-up trucks, forklifts, and pallet jacks." Dr. Romeo's letter was included in Stewarts's personnel file at Piggly Wiggly.

30. Upon information and belief, and according to the Long/Garza claimants' allegations, shortly after Dr. Romeo's letter, Stewart failed a random drug test given to him by Deacon on November 19, 2010.

31. Upon information and belief, and according to the Long/Garza claimants' allegations, Stewart failed another random drug test given to him by Deacon on May 10, 2011.

32. Upon information and belief, and according to the Long/Garza claimants' allegations, despite Piggly Wiggly's knowledge of Stewart's drug use, Piggly Wiggly continued to permit Stewart to operate the 2011 Silverado.

**Piggly Wiggly's Knowledge Of Stewart's Prior Vehicle Collisions and Violations**

33. On May 18, 2011, Stewart rear-ended a car on a freeway ramp in the same vehicle that subsequently struck and killed Long and Garza. Upon information and belief, and according to the Long/Garza claimants' allegations, Stewart was drug tested by Deacon, with a confirmation by an outside lab showing high levels of Hydrocodone, Fentanyl, and Alprazolam.

34. On June 11, 2011, Stewart, while operating a Piggly Wiggly vehicle, collided with his stepdaughter's car and damaged both her car and the Piggly-Wiggly vehicle. Upon information and belief, and according to the Long/Garza claimants' allegations, Stewart was drug tested by Deacon, with a confirmation by an outside lab showing high levels of opiates, Fentanyl, and Alprazolam.

35. On October 3, 2011, Stewart collided with a telephone pole in a Piggly-Wiggly vehicle. Upon information and belief, and according to the Long/Garza claimants' allegations, Stewart was drug tested by Deacon, with a confirmation by an outside lab showing high levels of Hydrocodone, Fentanyl, and Alprazolam. Despite this failure being noted in Stewart's personnel file, Piggly Wiggly did not take away Stewart's keys to Piggly Wiggly's vehicle.

36. On November 18, 2010, Stewart was convicted of speeding, driving 71 miles per hour in a 55 mile per hour "work zone" in a Piggly Wiggly vehicle.

37. On February 21, 2012, Stewart was convicted of speeding, driving 61 miles per hour in a 40 mile per hour zone in a Piggly Wiggly vehicle.

38. On February 24, 2012, Stewart was convicted of speeding, driving 68 miles per hour in a 55 mile per hour zone in a Piggly Wiggly vehicle.

39. Despite Piggly Wiggly's knowledge of Stewart's numerous prior motor vehicle accidents under the influence of drugs and numerous traffic violations, Piggly Wiggly continued to permit Stewart to operate the 2011 Silverado.

### Settlement Of The Long/Garza Claim

40. Prior to the filing of a formal Complaint, Piggly Wiggly and Continental engaged in settlement efforts with the Estates of Long and Garza.

41. In the face of substantial demands against Piggly Wiggly, including punitive damages, Continental contributed a significant, confidential amount towards the settlement of the Long/Garza Claim resulting in a full and final release of Piggly Wiggly, Stewart and the other Piggly Wiggly employees.

42. Continental's settlement payment was subject to an express reservation of all of Continental's rights and defenses available to it under the Policy and at law, including its rights to seek reimbursement from Piggly Wiggly of all or a portion of its payment, and that no action taken by Continental should be construed as a waiver of such reimbursement or Continental's coverage rights.

### INSURANCE BACKGROUND

### The Continental Policy

43. As noted, Continental issued to Piggly Wiggly the Policy, for the period of August 1, 2011 to August 1, 2012, with limits of liability of $25 million each incident and in the aggregate.

44. The Policy contains the following relevant Exclusion:

> **2. Exclusions**
>
> This insurance does not apply to
>
> **a. Expected or Intended Injury**
>
> > "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property. This

exclusion does not apply to Employers Liability claims for "bodily injury" covered by "scheduled underlying insurance."

**Piggly Wiggly's Application for the Policy**

45. Because Piggly Wiggly is a distributor that makes use of a fleet of vehicles, a key consideration in Continental's underwriting process was the potential automobile liability posed by Piggly Wiggly's operations, including whether Piggly Wiggly maintained and adhered to a fleet safety program.

46. Prior to the issuance of the Policy, Piggly Wiggly submitted to Continental an Accord Commercial Insurance Application. Question 19 of this application asks whether there is a formal, written safety and security policy in effect at Piggly Wiggly, to which Piggly Wiggly responded "yes."

47. Piggly Wiggly submitted to Continental a copy of its "Fleet Safety Program" with its Policy application ("Safety Program"). Piggly Wiggly's Safety Program included protocols for motor vehicle record checks, driver training, drug testing, accident investigation and driver incentives, and also provided that employees were only permitted to drive the vehicles for business purposes and not personal use.

48. In particular, Piggly Wiggly's Safety Program provides as follows:

- "Any Piggly Wiggly driver involved in an accident while under the influence of alcohol, narcotics or other illegal drugs will be considered guilty of gross misconduct and subject to immediate discharge."

- "Physical examinations must be passed prior to employment and each two years thereafter as per Sections 391.41 – 391.49 of the Motor Carrier Safety Regulations."

- "A Driver is also disqualified under Section 385.51 of the Motor Carrier Safety Regulations that shall include: A. Driving a commercial motor vehicle while having an alcohol

concentration of 0.04 percent or more. B. Under the influence of alcohol as prescribed by State Law. C. Refusal to undergo such testing as required. D. Driving a commercial vehicle while under the influence of a controlled substance. Remember, the use of alcohol and/or drugs could result in serious consequences of your career as a professional driver."

- A "Driver Violations Record and Review" process be implemented, which required that all moving violations be reported to the Director of Transportation and that the company will run MVR checks on all drivers annually.

- "Excessive violations such as speeding, reckless driving, improper lane switches, etc., and/or for unsafe operation of equipment such as repeated preventable accidents or a serious chargeable accident, will result in disciplinary action up to and including termination. Driving under the influence of alcohol or drugs will result in immediate termination."

- "In the event that a driver has a health problem that could disqualify him from driving, Piggly Wiggly management will reserve the right to request that the driver take a physical. Pending the outcome of the physical, the driver will either continue driving or be disqualified per Sections 391.1(b) and 391 Subpart E of the Federal Motor Carrier Safety Regulations."

- "Any employee who is taking a drug or medication, prescribed by the employee's physician, which may adversely affect that employee's ability to perform work in a safe or productive manner, is required to report such use of medication to his supervisor . . . The supervisor, in conjunction with the Medical/Personnel Departments, then will determine whether the employee can remain at work, and whether any work restrictions will be necessary."

- A "Motor Vehicle Accident Review Board" to meet as soon as possible after a serious accident.

## **COUNT ONE – RESCISSION OF THE POLICY**

49. Continental incorporates paragraphs 1 through 48 as if set forth fully herein.

50. Under Alabama Code § 27-14-7, an insurer may rescind an insurance policy where the insured has made material misrepresentations or omissions or concealed facts in an

application, which affected the insurer's decision to issue the policy, the amount of the coverage provided or the amount of the premiums.

51. Upon information and belief, and according to the Long/Garza claimants' allegations, prior to and during the span of Stewart's employment with Piggly Wiggly, Piggly Wiggly knew and repeatedly documented in company records that Stewart had a long-standing drug abuse problem and was daily taking prescription medications including Opiates, Benzodiazepines, Neurontin and Fentanyl exceeding the prescribed dosage amount, which limited and severely impaired Stewart's ability to safely operate a motor vehicle.

52. Upon information and belief, and according to the Long/Garza claimants' allegations, during the time of Stewart's employment and prior to the collision that caused Long's and Garza's deaths, Piggly Wiggly personnel, occupational doctors and medical staff performed numerous drug tests on Stewart, wherein Stewart tested positive for multiple drugs that impair the ability to drive.

53. Upon information and belief, and according to the Long/Garza claimants' allegations, during the span of Stewart's employment with Piggly Wiggly, Stewart was involved in numerous vehicle collisions and tested positive for high levels of opiates, Hydrocodone, Fentanyl, and Alprazolam during the time of such collisions. These drug test results were noted, included and clearly documented in Stewart's personnel file at Piggly Wiggly.

54. During the span of Stewart's employment with Piggly Wiggly, Stewart was convicted of speeding on numerous occasions while driving a Piggly Wiggly vehicle.

55. During the span of Stewart's employment with Piggly Wiggly, medical professionals warned Piggly Wiggly that Stewart represents a safety risk in the operation of

mobile equipment, including tractors, pick-up trucks, forklifts and pallet jacks. These warnings were documented in Stewart's personnel file at Piggly Wiggly.

56. Piggly Wiggly never suspended Stewart's driving privileges during the span of his employment with Piggly Wiggly.

57. In applying for the Policy from Continental, Piggly Wiggly represented that there exists a formal, written safety and security policy in effect at Piggly Wiggly. To further support its representation of the existence of such policy, Piggly Wiggly provided Continental the Piggly Wiggly Safety Manual with the Policy's application.

58. Contrary to its representations to Continental, Piggly Wiggly did not enforce the terms and provisions of its formal, written safety and security policy or those set forth in the Piggly Wiggly Safety Manual.

59. Piggly Wiggly represented to Continental that the statements on its Policy's application were true and accurate and that it had not concealed or misrepresented any material fact or circumstance concerning the application.

60. The information Piggly Wiggly provided to Continental in the application and underwriting process of the Policy was false and constituted a misrepresentation, omission, concealment or statement that materially affected the acceptance of the risk or the hazard assumed by Continental under the Policy.

61. The information Piggly Wiggly provided to Continental in the application and underwriting process of the Policy was a material contributing influence that induced Continental to issue the Policy.

62. Continental justifiably relied on the information Piggly Wiggly provided Continental in underwriting, issuing and calculating the premiums for the Policy.

63. Piggly Wiggly's misrepresentations and omissions in the information provided to Continental in the Policy's application and underwriting process were material.

64. Had Continental known the true facts, it would not have issued the Policy or would have issued the Policy upon different terms.

65. As a result of Continental's justifiable reliance on Piggly Wiggly's misrepresentations and/or omissions of material fact, Continental has been injured because it made payments on behalf of Piggly Wiggly under the Policy in connection with the Long/Garza Claim when the Policy was not intended to cover such claim.

66. Thus, Continental seeks a declaration that it is entitled to rescind the Policy.

67. In order to effectuate the rescission, Continental will tender to Piggly Wiggly the premium paid for the Policy.

68. In light of Continental's right to rescind the Policy, Continental is entitled to reimbursement of its entire payment in connection with the settlement of the Long/Garza Claim.

69. Continental has no adequate remedy at law.

**COUNT II – DECLARATION OF NO COVERAGE BASED ON THE POLICY'S EXCLUSION – EXPECTED OR INTENDED INJURY**

70. Continental incorporates paragraphs 1 through 68 as if set forth fully herein.

71. In the alternative to rescission of the Policy under Count I, Continental has no duty to indemnify or pay Piggly Wiggly any insurance proceeds under the Policy based upon application of the "Expected or Intended Injury" Exclusion in the Policy.

72. The Exclusion entitled "Expected or Intended Injury" contained in the Policy provides that the Policy does not apply to "bodily injury" expected or intended from the standpoint of the insured.

73. Upon information and belief, and according to the Long/Garza claimants' allegations, during the time of Stewart's employment and prior to the collision that caused Long and Garza's death, Piggly Wiggly personnel, occupational doctors and medical staff performed numerous drug tests on Stewart, wherein Stewart tested positive for multiple drugs that impair the ability to drive. These drug test tests were documented in Stewart's personnel file at Piggly Wiggly.

74. Upon information and belief, and according to the Long/Garza claimants' allegations, during the span of Stewart's employment with Piggly Wiggly, Stewart was involved in numerous vehicle collisions and tested positive for high levels of opiates, Hydrocodone, Fentanyl, and Alprazolam during the time of such collisions. These drug test results were documented in Stewart's personnel file at Piggly Wiggly.

75. During the span of Stewart's employment with Piggly Wiggly, Stewart was convicted of speeding on numerous occasions while driving a Piggly Wiggly vehicle.

76. During the span of Stewart's employment with Piggly Wiggly, medical professionals warned Piggly Wiggly that Stewart represents a safety risk in the operation of mobile equipment, including tractors, pick-up trucks, forklifts and pallet jacks. These warnings were documented in Stewart's personnel file at Piggly Wiggly.

77. Piggly Wiggly never suspended Stewart's driving privileges during the span of his employment with Piggly Wiggly.

78. Earlier on the day of the accident, co-employees of Stewart observed him behaving erratically and expressed concerns to their supervisor that Piggly Wiggly not allow Stewart to drive.

79. Based on Piggly Wiggly's knowledge of Stewart's long-standing drug abuse that affected his ability to operate a motor vehicle, including on the day of the accident, the claims and injuries that are the subject of the Long/Garza Claim were expected or intended from the standpoint of Piggly Wiggly.

80. The claims and injures that are the subject of the Long/Garza Claim are precluded from coverage based on the Policy's Exclusion entitled "Expected or Intended Injury."

81. Continental has no duty to indemnify or pay Piggly Wiggly any insurance proceeds under the Policy with respect to the Long/Garza Claim based on application of the Policy's Exclusion entitled "Expected or Intended Injury."

82. Since Continental has no duty to indemnify or pay Piggly Wiggly any insurance proceeds under the Policy with respect to the Long/Garza Claim based on application of the Policy's Exclusion entitled "Expected or Intended Injury," Continental is entitled to reimbursement of its entire payment in connection with the settlement of the Long/Garza Claim.

## **PRAYER**

WHEREFORE, Continental respectfully prays for judgment as against the defendant as follows and that the Court declare that:

1. On Count I, the Policy is void *ab initio* and that, as a consequence, Continental has no coverage obligations for the Long/Garza Claim;

2. On the alternative Count II, the claims that are the subject of the Long/Garza Claim are excluded from coverage under the Policy and that Continental has no coverage obligations for the Long/Garza Claim based on the Policy's Exclusion entitled "Expected or Intended Injury;"

3. Continental is entitled to reimbursement of its entire payment in connection with the settlement of the Long/Garza Claim;

4. Any further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff requests a jury trial of all issues triable of right by a jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: April 2, 2013

Respectfully submitted,

**STARNES DAVIS FLORIE LLP**

By: /s/ William Anthony Davis, III
William Anthony Davis, III
H. Thomas Wells, III
100 Brookwood Place, 7th Floor
P.O. Box 598512
Birmingham, Alabama 35259-8512
(205) 868-6000
(205) 868-6099 (Fax)

*Attorneys for Plaintiff Continental Casualty Company*