# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| CONTINENTAL CASUALTY COMPANY, | } } } | |
| Plaintiff, | } } | Case No.: 2:13-cv-00607-RDP |
| v. | } } | |
| PIGGLY WIGGLY ALABAMA DISTRIBUTING COMPANY, INC., | } } } | |
| Defendant. | | |

## MEMORANDUM OPINION

This case is before the court on Defendant's Motion for Summary Judgment (Doc. 52) and Plaintiff's Motion for Summary Judgment (Doc. 55), both filed November 3, 2014. These motions have been fully briefed. (*See* Docs. 53, 55-1, 57, 59, 62, 64).[1] Although relatively few facts are genuinely disputed in this action, the court concludes that those facts which are disputed are material and preclude summary judgment.

This insurance coverage dispute arises from a car wreck that killed two persons and sent another to prison. On June 27, 2012, while driving home from work, Jason Stewart swerved into an oncoming lane and struck a motorcycle, killing the driver and passenger. Jason worked for Defendant Piggly Wiggly Alabama Distributing Company ("Defendant") and was driving a company-owned vehicle at the time of the accident. A jury eventually convicted Jason of criminally negligent homicide while driving under the influence.

---

[1] The court acknowledges the pendency of Defendant's Objection and Motion to Exclude (Doc. 66), filed December 8, 2014, and the parties' briefs on that matter (Docs. 68, 70). However, in light of (1) the fact that the court has not relied in any way on the evidence which is the subject of Defendant's Motion (Doc. 66), and (2) the parties agreement that the evidence offered therein is not directly relevant to their cross motions for summary judgment, the court concludes Defendant's Motion (Doc. 66) is moot.

At the time of the accident, Defendant held an umbrella insurance policy with Plaintiff Continental Casualty Company ("Plaintiff").  Plaintiff paid over $8 million under this policy to settle a claim deriving from the accident.  Now, Plaintiff seeks to recoup this payment.  Specifically, Plaintiff seeks a declaratory judgment that Plaintiff is entitled to rescind its policy entirely because Defendant misrepresented that it was applying certain safety controls to all of its drivers, while, in actuality, it selectively excused Jason Stewart from compliance.  Alternatively, Plaintiff seeks a declaration that, under the policy's "expected or intended injury" exclusion, Plaintiff is excused from paying Defendant's claim related to the June 27, 2012, accident.  Defendant counters by asserting that Plaintiff is engaged in "reverse underwriting," by seeking to void payment on a legitimate claim.

For the reasons outlined below, and after careful review of the record and briefs, the court concludes that both Defendant's Motion for Summary Judgment (Doc. 52) and Plaintiff's Motion for Summary Judgment (Doc. 55) are due to be denied.

## I.    Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial. *See id.* at 324; *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997)

(facing a "properly supported motion for summary judgment, [the nonmoving party] must come

forward with specific factual evidence, presenting more than mere allegations").

The substantive law will identify which facts are material and which are irrelevant. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts

and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of*

*Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If

the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted. *See id.* at 249.

## II.    Facts[2]

### A.    Background

Defendant is a wholesale cooperative grocery distributor based out of Bessemer whose

shareholders and customers own independent retail grocery stores throughout the Southeast.

(Doc. 54-2, Bullard Decl. ¶ 2). Defendant has approximately 500 employees. (Doc. 54-1,

Bullard Dep. 59:15-18, 81:20-82:2). Currently David Bullard is Defendant's CEO (*id.* at

135:16-19), although he previously held a position in Human Resources. Defendant has a fleet

of vehicles, including tractor trailers driven by commercially licensed drivers (which distribute

---

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

the groceries) and private passenger vehicles driven by other employees. (*See* Doc. 54-2, Bullard Decl. ¶ 2).

### B.       Defendant's Insurance Policies

In addition to its primary general liability insurance and auto liability insurance,[3] Defendant bought three (renewable) one-year umbrella policies from Plaintiff which were in effect from August 1, 2010 to August 1, 2013. (*See* Doc. 54-30, Exs. 10, 12, 22 to Tegtman Dep., at 13-28, 33-34, 90-136). The relevant underwriting and renewal process for each successive policy is detailed below.

#### 1.       2010 Insurance Policy

Plaintiff does not seek rescission of the 2010 Policy. Nevertheless, it is instructive to review the events leading up to its issuance because the 2010 policy application and the application process are significant as it relates to the 2011 policy issued to Defendant.

On July 8, 2010, Defendant sent Plaintiff a submission for umbrella coverage through Statehouse Casualty Managers ("Statehouse"), Plaintiff's wholesale broker. (Doc. 56-1 at 2). An email from Statehouse to Plaintiff's 2010 underwriter, Rosemary Sica, suggests that Plaintiff requested information on Defendant's "safety controls" on the same day. (Doc. 54-29, Ex. 4 to Tegtman Dep., at 102). The next morning, on Friday, July 9, 2010, Statehouse requested information regarding Defendant's "safety controls" from Johnson & Johnson, the intermediary broker, who in turn requested the information from Defendant's insurance agent, Clark Associates, Inc. ("Clark"). (Doc. 56-1, at 4). Statehouse advised Defendant's agent that the underwriter for the policy "sounded like she wanted to have [information about the safety controls] before quoting." (*Id.*). Later, at or around 10:00 a.m., Johnson & Johnson sent

---

[3] Relevant to this action, Defendant purchased primary general liability insurance, auto liability insurance, and other types of insurance coverage from EMC Insurance Companies ("EMC") with $1 million limits for the policy year August 1, 2011, to August 1, 2012. (Doc. 54-3, EMC Aff. ¶¶ 2-5).

Statehouse a responsive email from Clark with an attached PDF document named "FLEETSAF.pdf." (Doc. 56-1, at 3). The attached document included pages fourteen to thirty of a document titled "<u>DRIVER SAFETY</u>" (the "Fleet Safety Manual" or the "Manual"). (Doc. 56-1, at 3; *see* Doc. 56-2). Very shortly thereafter, Statehouse sent Sica an email stating as follows:

> Attached is the fleet safety information. Please let me know if you need anything else to consider. We do need to have something to them by today unfortunately.

(*Id.* at 2). The only attachment to that email was the Fleet Safety Manual. (Doc. 56-2, at 3-19). Neither Plaintiff nor its agents requested any additional information regarding the Manual. (Doc. 54-28, Seigel Dep. 189:24-197:25). Later, however, Sica asked Statehouse:

> Can you tell me what controls they [*i.e.*, Defendant] have for the 55 [private passenger vehicles.] I assume that the sales force is driving these vehicles.
>
> > Do they check [Motor Vehicle Records]?
> > Do they have a Personal Use Policy for the drivers of the [private passenger vehicles]?
> > No drivers under 25 or over 65?

(*Id.* at 132). The same day, Statehouse replied that Defendant checked its drivers' Motor Vehicle Records, had a Personal Use Policy in effect, but that one or two drivers might be over 65 years old. (*Id.* at 131). In response, Plaintiff's underwriter stated:

> I assume the Personal Use Policy extends the use to spouses or does it limit the use to employees only. This is my last question . . . . I promise.
>
> I am finishing up my referral now and should have an answer for you on Monday.

(*Id.*). That afternoon, Statehouse replied that the Personal Use Policy allowed for spousal use in limited circumstances. (*Id.* at 130).

On July 12, 2010, Sica referred the submission to her supervisor for approval, noting that the main coverage exposure was auto, but that there was a "Fleet Safety Program" in place:

> There are 93 tractors, 55 [private passenger vehicles] and 1 light truck. . . . The [private passenger vehicles] are used by the managers and sales force. The risk has a Fleet Safety Program . . . which includes MVR checks, driver training, drug testing, accident investigation and driver incentives. DOT regulations are strictly enforced. There is a personal use policy in place for the [private passenger vehicles], only the employees are allowed to drive the vehicles for business purposes no pleasure use allowed.  The underlying auto has a $1m limit.

(Doc. 56-3, at 3).  Defendant suggests that that this communication demonstrates that Plaintiff (or at least one of its underwriters) understood Defendant had "personal use policies" in place for private passenger vehicles and a separate "Fleet Safety Program" only for its tractor trailers.[4]

After consummating the underwriting process, Plaintiff issued Defendant a policy (the "2010 Policy") with a $25 million limit for the policy period August 1, 2010, to August 1, 2011. (*See* Doc. 56-4).

## 2.   2011 Renewal Policy

Plaintiff issued a renewal policy to Defendant for the policy period August 1, 2011, to August 1, 2012 (the "2011 Renewal Policy").  (Doc. 56-9, 2011 Renewal Policy).  In May 2011, CRC Insurance Services ("CRC") contacted Plaintiff's underwriter, Jarrell Hall, and informed Hall that CRC was the new broker of record for the 2011 Renewal Policy.  (Doc. 56-32, Hall Decl. ¶ 6).  Due to this change in broker, Defendant's account was reassigned to the Birmingham office, where Hall became the handling underwriter.  (*Id.* at ¶ 7).  CRC submitted pertinent underwriting information from the prior year to Hall in order to begin the process of underwriting the 2011 Renewal Policy.  (*See* Doc. 56-5).

Hall reviewed and relied on the information contained in the 2010 underwriting file, including the Fleet Safety Manual, in determining whether to bind coverage and calculating

---

[4] To be clear, the Rule 56 evidence makes clear that the Fleet Safety Program is not synonymous with the Fleet Safety Manual.  The Fleet Safety Program, as referenced by Sica, is more comprehensive than the Fleet Safety Manual.  The Fleet Safety Program includes "MVR checks, driver training, drug testing, accident investigation and driver incentives," which are not specifically included in the Manual.

Defendant's premium.  (Doc. 56-6, Hall Dep. 99:5-10, 105:13-106:17; 111:3-112:3; Doc. 56-32, Hall Decl. ¶ 13).[5]  Hall asked CRC whether Defendant's Fleet Safety Manual remained in force. (Doc. 56-6, Hall Dep. 105:22-106:10; 110:9-14; Doc. 56-32, Hall Decl. ¶ 9).  CRC advised Hall that the Safety Program was still in place.  (Doc. 56-6, Hall Dep. 101:21-102:5, 108:20-22, 110:6-14; Doc. 56-32, Hall Decl. ¶ 11).  In another exchange, CRC referenced Hall's need for certain updated information on Defendant's "fleet."  (Doc. 54-30, Ex. 11 to Tegtman Dep., at 29 (emphasis added)).  Fourteen minutes later, CRC followed up with Hall suggesting "I just spoke to producer and [premiums] won't change. . . .  Producer monitors fleet regularly and still has 93 tractors of which 10 sit in terminal and only used for backup purposes."  (*Id.*).

It is undisputed that Hall never asked any question about who the Fleet Safety Manual applied to, whether there had been any violations of the Fleet Safety Manual, or other questions about its enforcement.  (Doc. 54-28, Seigel Dep. 189:24-197:25; *see also* Doc. 54-30, Exs. 10-21 to Tegtman Dep.).  According to Hall, individual employee's driving record, accident history, and drug test history were not important, relevant, or material to him in underwriting.  (Doc. 56-6, Hall Dep. 154:12-17, 177:6-178:10).  Hall has testified that he believed the Fleet Safety Manual was applicable to all drivers of Defendant's vehicles, not just Defendant's tractor trailers.  (*Id.* at 115:23-116:16; Doc. 56-32, Hall Decl. ¶ 12).  However, Hall also testified that no one ever told him that the Manual applied to personal passenger vehicles.  (Hall Dep. 116:7-16).

Regardless, Hall relied upon the Manual when making his referral to management for approval.  (Doc. 56-32, Hall Decl. ¶ 15).  Mirroring Sica's earlier 2010 report, Hall documented that Defendant had a "Fleet Safety Program" in effect and that DOT regulations were strictly enforced for Defendant's tractor trailers, personal passenger vehicles, and one light truck.  (Doc.

---

[5] Hall has testified, however, that he never saw the original underwriting emails from 2010 between Plaintiff's 2010 underwriter and Plaintiff's broker.  (Doc. 56-6, Hall Dep. 191:10-19).

56-8, Monoline Umbrella Risk Documentation, at 4, 7; Doc. 56-32, Hall Decl. ¶ 15).  In reliance on the above-mentioned considerations, Plaintiff issued the 2011 Renewal Policy to Defendant. (Doc. 56-32, Hall Decl. ¶¶ 8-13).  Plaintiff seeks rescission of the 2011 Renewal Policy.

### 3.        2012 Renewal Policy

Soon after Jason Stewart's June 27, 2012, accident, Plaintiff doubled Defendant's premium and issued Defendant a second policy renewal covering the policy period from August 1, 2012 to August 1, 2013 (the "2012 Renewal Policy").  Jason's accident occurred 35 days before the expiration of the 2011 Renewal Policy, and Plaintiff contends that "[b]y the time Plaintiff's underwriting department was notified of the accident, it was too late to non-renew the policy under the Alabama regulations."  (Doc. 54-29, Tegtman Dep. 291:22-292:13).  Although Plaintiff issued the 2012 Renewal Policy, Plaintiff notified Defendant that it would not renew for the 2013-2014 policy period.  (Doc. 56-6, Hall Dep. 247:2-6).  Plaintiff does not seek the rescission of the 2012 Renewal Policy.

### B.        Jason Stewart

### 1.        Background

On February 23, 2009, thirty-five year old Jason Stewart began working for Defendant as a maintenance supervisor of Defendant's Building and Grounds Department.  (Doc. 54-1, Bullard Dep. 220:14-221:12; Doc. 54-4, J. Stewart Dep. 12:10-11, 292:2-4; Doc. 54-10, Reynolds Dep. 62:12-25, 111:19-112:23).  Jason was the son of Defendant's then-CEO Dennis Stewart.[6]  (*Id.* at 31:20-23; Doc. 54-10, Reynolds Dep. 62:12-25; 111:19 to 112:23).  Both Dale Reynolds (Defendant's Director of Operations) and David Bullard (Defendant's then-Human

---

[6] Dennis Stewart left Piggly Wiggly at or around June 2012.  Defendant alleges that Stewart retired and David Bullard had been promoted to President and CEO as of June 1, 2012. (Doc. 54-1, Bullard Dep. 135:17-19). Plaintiff suggests that certain evidence reflects that Dennis was terminated from Piggly Wiggly following the June 27, 2012 incident.  For the purposes of this motion, Dennis Stewart's departure date and circumstances are irrelevant.

Resources Director and its current CEO) advised Dennis that they were opposed to hiring Jason due to nepotism problems and creating bad morale by appearing to provide Jason with preferential treatment.   (Doc. 54-1, Bullard Dep. 221:13-223:15; Doc. 54-10, Reynolds Dep. 71:16-72:22).  Notwithstanding Reynolds and Bullard's concerns, Defendant hired Jason and issued him a credit card and company truck.  (Doc. 54-10, Reynolds Dep. 111:19-114:6).

### 2.      Jason's Pain Medication and Drug Treatment

### (a)      Jason's History of Prescription Drug Use

Jason has a history of prescription drug use for pain management.  Since April 2001, Jason has been regularly treated by David W. Cosgrove, M.D., at a pain management clinic due to permanent injuries he sustained as a passenger in a 1993 car wreck and as a driver in a 1995 wreck.  (Doc. 54-4, J. Stewart Dep. 321:12-325:23; Doc. 54-5, Cosgrove Decl. ¶¶ 2-4).   Dr. Cosgrove never thought Jason was a safety risk in working or driving a vehicle and never expected Jason to have an automobile accident.   (Doc. 54-5, Cosgrove Decl. ¶¶ 6-9).   Dr. Cosgrove never communicated with Defendant about Jason.  (*Id.* at ¶ 8).

In July 2009, Jason began seeing general practitioner Wallace Purdy, M.D.  (Doc. 54-6, Purdy Aff. ¶ 2).   Dr. Purdy prescribed Xanax for Jason during his initial visit in July 2009 for anxiety, stress, and panic attacks.  (*Id.* at ¶ 2).  Dr. Purdy never thought Jason was a safety risk and never warned Jason that he should not drive a vehicle.  (*Id.* at ¶¶ 8-9).  Dr. Purdy never communicated with Defendant about Stewart.  (*Id.* at ¶ 10).  Dr. Purdy did not expect Stewart to have an automobile accident.  (*Id.* at ¶ 11).

Under Defendant's drug testing policies,[7] Jason took ten different drug and alcohol tests during his employment, including pre-employment, random, post-accident, and one "for cause"

---

[7] All of Defendant's employees, including management, take a pre-employment drug test and random tests throughout their employment, which includes breath alcohol testing. (Doc. 56-10, Deacon Dep. 33:10-15; Doc. 54-1,

test. (Doc. 54-1, Bullard Dep. 371:15-18, 372:18-23, 397:12-14).    Jason generally had a prescription for medications that showed up on his tests.  (Doc. 54-1, Bullard Dep. 403:21-404:13; Doc. 54-8, Romeo Dep. 147:22-149:4).  Defendant claims that if had Jason ever tested positive, he would have been fired. (Doc. 54-1, Bullard Dep. 404:3-13).   Plaintiff disputes Defendant's characterization that Jason "passed" every drug test.  (Doc. 59, at ¶ 8).  Although Jason received "negative" results on his drug tests, Defendant suggests this indicates only that Jason had a prescription for the drugs found in his urine sample.  A urine test would not confirm whether Jason was using medication in accordance with the prescribed doses.

### (b)    Jason's Application and Pre-Employment Drug Screening

When he applied for work in 2009, Jason disclosed that he was taking various prescription medications, including Xanax and various painkillers. (Doc. 56-15, Medical Rev., at 7).  Jason took a pre-employment drug test, which came back "negative." (Doc. 54-1, Bullard Dep. 371:15-18; Doc. 54-4, J. Stewart Dep. 314:16-20).  However, Defendant does not dispute that, at the time of his pre-employment drug test, Jason did not have a prescription for the Xanax which appeared on his pre-employment drug test.   (Doc. 57, at 8 ¶ 16).   Although Jason disclosed that he was taking Xanax (*id.*), Defendant never checked to see if Jason had a prescription for the medication.

Nevertheless, Defendant claims that Jason "took and passed [the] pre-employment drug test." (*Id.* (citing Doc. 54-1, Bullard Dep. 371:15-18; Doc. 54-4, J. Stewart Dep. 314:16-20)). And, in any event, Defendant claims that Jason reported his legal prescription medications to

---

Bullard Dep. 149:6-7, 395:2-14).  Employees are subject to post-accident drug tests if there is an accident at work or in a company vehicle and "for cause" tests when there is reasonable suspicion of impairment. (Doc. 54-1, Bullard Dep. 396:6-397:20). As part of the drug testing process, Defendant receives a one-page report stating whether the employee passed or failed a drug test.  Defendant generally does not receive any data from the lab showing the levels of any medications found in the sample. (Doc. 54-8, Romeo Dep. 52:2-6; Doc. 54-1, Bullard Dep. 146:10-22, 402:18-19).  Jason's August 2010 "for cause" drug test is an apparent exception to this policy; at that time, Bullard and Deacon expressly requested quantitative test results from Dr. Romeo.  (Doc. 54-1, Bullard Dep. 255:2-8; Doc. 56-10, Deacon Dep. 70:19-71:14).

Defendant's medical and personnel department by reporting them to Defendant's on-site nurse, Ted Deacon. (Doc. 56-10, Deacon Dep. 137:13).[8]

### (c) Bullard's Referral of Jason to Defendant's Employee Assistance Program

On August 2, 2010, David Bullard (who then worked in H.R.) referred Jason to Defendant's Employee Assistance Program ("EAP Program") administered by Behavioral Health Services ("BHS") for depression. (Doc. 54-2, Bullard Decl. ¶ 9). Bullard told BHS he did not think Jason's issues were medication-related. (Doc. 54-1, Bullard Dep. 249:10-251:7). Through the EAP Program, Jason saw Dr. Alfred Habeeb, a psychiatrist, from August 19, 2010, to March 10, 2011. (Doc. 54-9, Habeeb Aff. ¶ 2). During Jason's first office visit on August 19, 2010, Dr. Habeeb prescribed him Depakote. (*Id.* at ¶ 3).

On Monday, August 23, 2010, four days after Jason was prescribed the Depakote, Jason told Bullard he was not feeling well. (Doc. 54-1, Bullard Dep. 251:11-17). Jason said that his doctor changed his medication and that he had not taken his medication that day. (*Id.*). Bullard did not think Jason was impaired. (*Id.* 251:10-252:18, 253:5-8). Nevertheless, Bullard noticed that Jason was visibly "not in good shape," as his "speech was slurred and his motor skills were diminished." (Doc. 56-24, Ex. 53 to Bullard Dep., at 2).

### (d) Jason's August 25, 2010 Incidents

During the week of August 23, 2010, several employees reported to Bullard that Jason was slurring his speech, yelling at employees, sleeping at work, driving very unsafely, and generally appeared in bad shape and "stoned." (*See id.* at 2-3). On August 25, 2010, Bullard

---

[8] Deacon testified that he took three steps upon learning of Jason's medications. (Doc. 54-7, Deacon Dep. 137:13). First, Deacon discussed the medications with Jason. Second, Deacon regularly observed Jason and never saw any signs of impairment in Jason during the nearly three and one-half years Jason worked for Defendant. Third, Deacon called Dr. Bruce Romeo, Defendant's occupational health physician and Medical Review Officer, and told him that Defendant had an employee taking those medications, and asked whether that posed any issues. (*Id.* at 137:5-138:19; 217:17-219:5). Dr. Romeo responded that the medications did not cause any concern as long as taken as prescribed. (*Id.*). Therefore, Deacon concluded, Jason Stewart was not a safety risk. (*Id.* at 218:6-9).

called the EAP Program and requested they contact Jason's physicians to make sure they were coordinating his medications appropriately.   (Doc. 56-24, Ex. 53 to Bullard Dep., at 2-3). Bullard told Reynolds that he was concerned with Jason's safety and his operation of equipment. (*Id.*). Bullard instructed Reynolds that he wanted Jason "off the tractor and . . . wanted him to take a drug test so that [they] could have a medical review officer review his medications and tell [them] if he needs to be on the equipment."   (*Id.*). Bullard determined that Jason should no longer be allowed to operate the heavy equipment, but did not restrict Jason's use of his company-vehicle. (Doc. 54-1, Bullard Dep. 263:4-6, 264:12-15).[9]

On the same day, Bullard ordered a "for cause" drug test for Jason. (Doc. 54-1, Bullard Dep. 255:3-15, 260:14-16).   Jason had prescriptions for the medications found in his system. (Doc. 54-1, Bullard Dep. 260:10-17).   Defendant's nurse, Ted Deacon, requested that quantitative results be provided to him so that he could determine the levels of the drugs in his system to determine if "overuse of [Jason's] prescribed medications . . . was the issue." (*Id.* at 255:2-8; Doc. 56-10, Deacon Dep. 70:19-71:4).   As a result, Bruce W. Romeo, M.D., of the Alabama Center for Occupational Medicine and Prevention, P.C., sent Defendant a letter dated September 1, 2010, stating:

> Jason Stewart's drug screen results and prescription record were reviewed (including an alprazolam[10] urine level that exceeded the limit of measurement). It is concluded that he represents a safety risk in the operation of mobile equipment, including tractors, pick-up trucks, forklifts, and pallet jacks. If there are any questions regarding this, please don't hesitate to contact me.

(Doc. 56-25, Romeo Rep., at 2).[11]

---

[9] At around 11:00 a.m. on the same day, Jason received a speeding ticket as discussed above.  (Doc. 54-4, J. Stewart Dep. 304:23-306:12; Doc. 54-4, Ex. 149 to J. Stewart Dep., at 151).

[10] Alprazolam is a generic for Xanax the anti-anxiety medication.  (Doc. 54-8, Romeo Dep. 109:3).

[11] During his August 30, 2010, office visit with Dr. Habeeb, Jason reported adverse side effects from the Depakote, including increased sleepiness.  (Doc. 54-9, Habeeb Aff. ¶ 4). Dr. Habeeb discontinued the Depakote and

When Bullard raised Dr. Romeo's concerns with Dennis Stewart, Dennis relayed to him that there were recent changes to Jason's medications and that he would call Dr. Romeo.  (Doc. 54-1, Bullard Dep. 262:8-266:18).   Dr. Romeo spoke with Dennis, who reiterated to him that Jason had been going through some changes in medication and dosages which he attributed to Jason's behavior and that it was his (Dennis's) belief once the medication issue was straightened out, Jason would be okay.   (*Id.*).   Dr. Romeo testified he never recommended that Defendant permanently prohibit Jason from using mobile equipment. (Doc. 54-8, Romeo Dep. 137:18, 138:3-8). Dr. Romeo testified that he never expected, never had a high degree of certainty, and never believed there was any likelihood, probability, or substantial risk that Jason would have an accident and hurt someone at any point in time, including at the time of his September 1, 2010, letter. (*Id.* at 112:10-23, 138:9-139:11).   According to Dr. Romeo, the medication levels in the August 26, 2010, test posed only a "marginally increased risk" -- but still a "low probability" -- of Jason having an accident. (*Id.* at 119:2-120:2).

Bullard testified that, if it were his decision, he would not have let Jason drive after the September 1, 2010, letter.  (Doc. 54-1, Bullard Dep. 265:5-266:18).  According to Bullard, if it had been up to him, he would have taken Jason Stewart out of the truck until he was sure that the level of medication issue was under control. (*Id.* at 266:12-18).   However, Dennis Stewart told Bullard that Jason could drive.  (*Id.* at 262:8-266:18).   Later, in May 2011, Defendant's on-site nurse, Ted Deacon, asked Dr. Romeo to review the levels of medications in Jason's drug test to see if he was a safety risk.  (Doc. 56-10, Deacon Dep. 210:12-211:19).   Dr. Romeo did not express any concerns then or at any time thereafter.  (*Id.*).

---

changed Jason to a different medication, Celexa. (*Id.*).  Jason later reported Celexa worked well without any adverse side effects.  (*Id.* at ¶ 5).

### (e)   Jason's October 3, 2011, Incident

On October 3, 2011, thirteen months after the September 1, 2010, letter, Jason went to see Dr. Romeo after an accident on the way to work in which he swerved to avoid a dog.  (Doc. 54-8, Romeo Dep. 72:13-73:6; *see* Doc. 54-1, Ex. 51 to Bullard Dep., at 107).   Dr. Romeo examined Stewart according to protocol and sent him back to work that same morning, with a full release to all job duties with no restrictions.  (Doc. 54-8, Romeo Dep. 72:13-73:6, 77:11-21, 72:13-73:23, 79:15-18, 146:7-11, 139:5-20, 258:21-259:6; Doc. 54-8, Ex. 75 to Romeo Dep., at 133).  Dr. Romeo saw no signs of impairment during that visit and did not have any concerns that Stewart would hurt anyone in a vehicular accident.[12]  (*Id.*).  Two months later, Stewart passed an on-site random drug test, showing no evidence of any illegal or prescription drugs. (Doc. 54-1, Bullard Dep. 378:6-18).

### (f)   Defendant's Knowledge of Jason Stewart's Drug Use

Defendant clearly knew of Jason's use of prescription medication.  Specifically, Deacon (Defendant's on-site nurse), Reynolds (Director of Operations and Jason's direct supervisor), Bullard (Human Resources Director turned CEO), and Dennis Stewart (then-CEO and Jason's father) each had direct knowledge of such use.  (Doc. 56-10, Deacon Dep. 50:15-17; Doc. 54-1, Bullard Dep. 215:20-216:9; Doc. 54-10, Reynolds Dep. at 140:15-17).  Only Stewart's father, however, was aware that Jason had gone to rehab in 2007 in connection with his prescription drug use.  (Doc. 54-4, J. Stewart Dep. 63:14-22, 66:1-5).

Reynolds believed that any potential impairment issue was being addressed by Bullard, and thus it was unnecessary for him to handle it. (Doc. 54-10, Reynolds Dep. 40:11-41:4; 122:12-128:8).  In addition, Reynolds never observed Jason exhibiting erratic behavior.  (*Id.* at

---

[12] As Plaintiff is quick to clarify, Dr. Romeo's examination did not involve a determination of whether Jason was abusing prescription medication.   (Doc. 60-2, Smith Dep. 84:11-85:1, 86:1-87:4, 91:19-93:11; Doc. 60-3, Smith Dep. 188:6-13).

107:9-13, 117:25-118:4, 123:10-16, 126:14-15, 128:6-8). Both Bullard and Deacon confirm that, in an attempt to manage Jason's usage, Dennis Stewart doled out Jason's medications because Jason was "taking the medication too quickly." (Doc. 56-10, Deacon Dep. 300:6-301:11; Doc. 54-1, Bullard Dep. 110:19-111:6).   Deacon understood that Jason had a problem with prescription medication; however, he "hoped" that Defendant could rely on Dennis Stewart to prevent his son from abusing his prescription medication.  (Doc. 56-10, Deacon Dep. 170:9-17).

### 3.   Jason's Driving and Motor Vehicle Record

At the time Jason was hired, he had never had a DUI, and his license had never been suspended or revoked, except for a short suspension for traffic tickets when he was 16 or 17 years old.  (*Id.* at 254:1-22).  Nevertheless, both Reynolds and Bullard disagreed with Dennis's decision to issue Jason a company vehicle.  (Doc. 54-1, Bullard Dep. 380:19-381:21).

At the end of each calendar year, Defendant conducts an annual Motor Vehicle Record ("MVR") search for all employees who may drive a company-owned vehicle. (Doc. 54-1, Bullard Dep. 230:7- 10; 231:6-15).  According to Defendant, only three speeding tickets were disclosed as part of Defendant's annual MVR searches on Jason — one speeding ticket in July 23, 2007 (nearly two years before he started working for Defendant) and two in August 2010. (Doc. 54-4, Ex. 148 to J. Stewart Dep.).

During his tenure with Defendant, Jason was involved in a number of other driving incidents.  On May 18, 2011, Jason rear-ended another vehicle in his company vehicle. (Doc. 56-26, Accident Reps., at 2-3).  On June 11, 2011, Jason totaled his daughter's car by backing into it in his driveway.  (*Id.* at 4-5). Plaintiff claims that Defendant was aware of these two accidents, but that no disciplinary action was taken against him. (Doc. 54-4, J. Stewart Dep. 105:2-108:3; 108:20-110:13). As discussed above, on October 3, 2011, Jason was in an accident in a company

vehicle where he swerved to avoid hitting a dog and hit a telephone pole. (Doc. 56-26, Accident Reps., at 7-10).  Jason had to seek medical treatment as a result. (*Id.*).

After October 3, 2011, and prior to June 27, 2012, Jason did not have any other car accidents (*see id.* at 380:5-7), and Defendant's last annual MVR search in December 2011 reflected only one speeding ticket (in August 2010) in the previous three years.  (*Id.* at 384:8-10; Doc. 54-4, Ex. 148 to J. Stewart Dep., at 146).  Jason received a speeding violation on January 28, 2012, and testified that he likely reported the violations to Reynolds.  (Doc. 54-4, J. Stewart Dep. 138:9-141:21).  Defendant argues, however, that it did not learn about that speeding ticket until after the June 27, 2012, accident because Defendant conducts its MVR searches at the end of the year.  (Doc. 54-1, Bullard Dep. 230:3-17).

### 4.    Jason Stewart's Work Performance

Plaintiff and Defendant offer very different accounts and characterizations of Jason's workplace performance.  Plaintiff offers deposition testimony from Jason's supervisors and coworkers that suggest he benefited from preferential treatment during his tenure with Defendant.  (Doc. 55 at 15-18).  Plaintiff recounts episodes where Jason: was "not acting right" and walking with an unsteady gait (Doc. 54-15, Farr Dep. 22:6-23:8, 53:20-55:12, 67:22-69:12); appeared groggy, had slurred his speech, or had stumbled (Doc. 56-17, Weston Dep. 64:9-71:16); looked "stoned and "glassyeyed" (Doc. 56-20, Dawson Dep. 28:23-29:7; 31:4-32:9; 33:20-35:18; 39:11-21); and experienced mood swings and was sleeping during work hours (Doc. 54-14, Rudolph Dep. 18:13-20:17; 22:5-24:24; 27:9-29:20; 34:4-37:22).

One incident, caught on the surveillance video from the warehouse, depicts Jason operating a "tugger" in an unsafe manner, playing around, and falling off the tugger while it was

still moving.  (Doc. 54-10, Reynolds Dep. 108:24-109:5).[13]   According to some of Jason's coworkers, Jason would regularly discuss drinking and taking drugs, and his behavior led several to believe he was impaired.  (*See, e.g.*, Doc. 56-23, Lewis Dep. 16:21-26:16, 29:7-31:13). According to Plaintiff, Jason's behavior was reported to management several times, but Defendant neither disciplined Jason nor took action to limit his driving privileges.  (Doc. 54-1, Bullard Dep. 263:4-6).[14]   Plaintiff suggests that even employees who never saw Jason "impaired," still referenced incidents in which he was slurring his speech, exhibiting diminished motor skills, sleeping, or acting in a manner consistent with drug use. (*See, e.g.*, Doc. 54-14, Rudolph Dep. 18:13-20:17, 22:5-24:24, 27:9-29:20, 34:4-37:22).

Defendant disputes Plaintiff's characterization of Jason's work behavior and counters that Jason was rarely, if ever, impaired.  (*See* Doc. 53, ¶¶ 10-23; Doc. 57, ¶ 17).  Defendant alleges that of Defendant's fifteen current or former full-time employees or temporary workers who were deposed in this case, eight testified they *never* saw Jason acting impaired.[15]   Five other employees testified they saw Jason sleepy or not acting right at some point, but only once or a few times in almost three and a half years.  (*See* Doc. 54-15, Farr Dep. 77:6-15; Doc. 54-16, Dawson Dep. 64:16-65:19; Doc. 54-17, Rivers Dep. 31:9-13, 35:4-22, 36: 13-16; Doc. 56-17,

---

[13] Bullard testified if he had seen the video at the time in question, he would have disciplined Jason for such conduct.  (Doc. 54-1, Bullard Dep. 362:21-364:6).  Several other individuals in management saw the tape after it occurred but took no steps to discipline Jason. (*Id.*).  Plaintiff claims this demonstrates another "blatant exception" to its otherwise strict enforcement of its "Safety Program and related policies" (Doc. 55-1, at ¶ 21), a point which Defendant, of course, disputes.  (Doc. 57, at ¶ 21).

[14] Defendant disputes the allegation that it took no action in response to Jason's behavioral issues and points to Jason's involvement with Defendant's Employee Assistance Program ("EAP Program"), administered by Behavioral Health Services ("BHS").  (*See* Doc. 53 ¶¶ 10-21).

[15] (*See, e.g.*, Doc. 54-1, Bullard Dep. 249:1-2; 252:17; 253:8; Doc. 54-2, Bullard Decl. ¶ 10; Doc. 56-10, Deacon Dep. 53:5-6, 56:15-17; Doc. 54-4, J. Stewart Dep. 342:22-343:1; Doc. 54-10, Reynolds Dep. 123:10-16; Doc. 54-11, Jessen Dep. 54:15-55:9, 69:16-20; Doc. 54-12, Hogeland Dep. 26:5-12, 28:12-20; Doc. 54-13, D. Stewart Dep. 192:21-23; Doc. 54-14, Rudolph Dep. 61:18-62:1).  Temporary worker Kenneth Rudolph testified he never saw Jason Stewart acting messed up at work, and the only reason Rudolph thought medications affected Stewart was because Stewart acted sleepy and moody. (Doc. 54-14, Rudolph Dep. 61:18-62:1, 63:9-14).

Weston Dep. 64:9-18; Doc. 54-19, Smith Dep. 47:10-49:6).  According to Defendant, Plaintiff's sources consist of three temporary workers, two of whom quit working for Defendant in December 2009 (Robert Scott) and August 2010 (Greg Chaviest), and the other, Kenneth Rudolph, worked with Jason for five weeks ending April 26, 2012.  (Doc. 54-20, Scott Dep. 10:11-12, 35:14-16, 41:4-14, 52:9-23; Doc. 54-21, Chaviest Dep. 11:14-22, 52:10-17, 54:23-56:12, 57:7-11, 58:11-18; Doc. 54-14, Rudolph Dep. 52:15-53:7, 54:19-21, 58:3-59:18).  And, as Defendant notes, Rudolph never testified that he saw Stewart impaired.

Additionally, Defendant contends that, in Jason's three-and-a-half years of employment, Jason never had a workplace accident or an accident, even though he drove many work errands in a company vehicle. (Doc. 54-4, J. Stewart Dep. 276:12-23, 278:6-280:10).  However, other evidence suggests that Jason's job did not require a company truck and that he did not frequently use a vehicle for job-related duties.  (Doc. 54-21, Chaviest Dep. 36:9-37:8; Doc. 54-19, Smith Dep. at 58:19-59:4).

### 6.    June 27, 2012 Accident

Upon arriving at work on June 27, 2012, Jason spoke with his supervisor, Dale Reynolds. (Doc. 54-10, Reynolds Dep. 161:22-162:6).  Jason was alert, had his faculties about him, and did not seem impaired. (*Id.* at 162:12-25).  During the morning break, Jason went to Jimmy Smith's office, a common place for people to gather during breaks. (Doc. 54-22, Smith Trial Tr. 6:8-13, 3:8-4:13, 7:3-12).  There, Jason took a nap in a chair. (*Id*). Smith testified that he observed Jason slurring his words, and, when the break was over, Jason did not immediately wake. (Doc. 54-19, Smith Dep. 69:10-14; 54-16, Dawson Dep. 68:6-13).   Smith reported Jason's behavior to Reynolds.  (Doc. 54-10, Reynolds Dep. 163:2-22).  But, when Reynolds looked at the security camera footage, Reynolds saw Jason had already left Smith's office.  (*Id.* at 163:15-22).

Smith testified he talked with Jason later that same day, around mid-day, and Jason was alert and fully functional. (Doc. 54-19, Smith Dep. 83:1-84:10). Smith was comfortable with Jason driving; otherwise, Smith testified he would have reported Jason. (*Id.*, 84:11-14). Smith then told Reynolds he (Smith) had seen Jason again, and Jason was fine. (Doc. 54-10, Reynolds Dep. 163:23-164:11).

Jim Weston and Herschel Farr, members of Jason's crew, saw Jason and also testified that he was fine, alert, and they had no concerns about Jason driving. (Doc. 56-17, Weston Dep. 78:21-79:21, 81:1-4; Doc. 54-15, Farr Dep. 77:19-78:19).   Reynolds had a face-to-face conversation with Jason at 11:30 a.m., just before Jason left for lunch. (Doc. 54-10, Reynolds Dep. 164:12-17).  Later the same day, Reynolds had another discussion with Jason around 3:15 p.m. (*Id.* at 165:15-20).  In both conversations Reynolds felt Jason was alert and not impaired. (*Id.* at 165:6-14, 166:23-25-167:4).  During this second conversation, Steve Fowler (another of Defendant's employees) was also present and observed nothing unusual about Jason.  (Doc. 54-23, Fowler Decl. ¶ 2).[16]

Jason left work at approximately 3:30 p.m. and went to a coworker's home.  (Doc. 54-4, J. Stewart Dep. 221:8-224:5).  Jason left the coworker's home around 4:30 p.m. to drive home. (*Id.*).  After about thirty minutes of driving, Jason's vehicle was hit by an 18-wheeler tractor trailer that drove off without stopping.  (*Id.*).  Jason called Reynolds and expressed concern that he would be fired due to the accident.  (*Id.* at 222:15-226:11, 367:11-23).  Reynolds told Jason to get a police report.  (*Id.*).  Reynolds testified that Jason did not sound impaired during that call. (Doc. 54-10, Reynolds Dep. 169:1-5).

---

[16] Every witness deposed in this case who was working at Piggly Wiggly on the day of the accident testified he or she was surprised by the accident. Those who saw Jason on June 27, 2012, further testified they had no reservations about him driving.

Following Reynolds advice, Jason called 911. (Doc. 54-4, J. Stewart Dep. 367:3-10). The 911 operator told Jason to go to a gas station at the next exit where a state trooper would meet him. (*Id.*). Jason took Exit 144 off I-20 and went to a BP station where he met with Alabama State Trooper Jon L. Brummitt, who arrived at 5:15 p.m. (*Id.* at 368:1-3; Doc. 54-24, Brummitt Decl. ¶¶ 1-2; Doc. 54-24, Ex. 2 to Brummitt Decl., at 4:18-22; 7:18-23). At the BP station, Jason appeared normal to Brummitt and did not seem under the influence of drugs or alcohol. (Doc. 54-24, Brummitt Decl. ¶¶ 2-3; Doc. 54-24, Ex. 2 to Brummitt Decl. at 5:16-17, 6:3-6, 18:7-15). Brummitt did not expect that Jason would be involved in an accident. (Doc. 54-24, Brummitt Decl. ¶ 3). Jason then called Reynolds to let him know he got a report. (Doc. 54-10, Reynolds Dep. 169:12-14). Reynolds testified that Jason "seemed fine" and "seemed perfect" during the call, and Reynolds had no concerns about Jason's ability to drive home. (*Id.* at 169:16-20).

While driving home on Highway 411 near Moody, at 5:45 p.m. (just 10-15 minutes after meeting with Brummitt), Jason swerved into the oncoming lane and ran into a motorcycle driven by Robert Long and ridden by his passenger, Debra Garza. (Doc. 54-4, J. Stewart Dep. 373:4-374:6). Both Long and Garza were killed. Jason testified that he had leaned down to pick up a pack of cigarettes on the floorboard just before the wreck. (*Id.* at 373:7-21, 376:22-377:2). Multiple eyewitnesses who were driving on Highway 411 at the time of the accident observed Jason's truck going off the road, then going back onto the road, then going across the middle line, and finally, into oncoming traffic without ever making an attempt to correct his position before hitting the victims. (Doc. 56-28, Moore Trial Tr. 3:12-5:16, 4:10-19; Doc. 56-28, Johnson Trial Tr. 20:5-22:2; Doc. 56-28, Bird Trial Tr. 37:9-38:14; Doc. 56-28, Brownlee Trial Tr. 63:8-24; Doc. 56-28, Carroll Trial Tr. 75:24-78:1).

Jason was later charged with manslaughter and vehicular homicide. (Doc. 54-4, J. Stewart Dep. 378:3-6). The jury found Jason not guilty of manslaughter or vehicular homicide, but convicted him of criminally negligent homicide while driving under the influence. (Doc. 54-4, J. Stewart Dep. 378:11-379:7). A blood sample taken over three hours after the wreck was negative for alcohol and showed the presence of Jason's prescription medications, including Hydrocodone, Fentanyl, and Xanax. (Doc. 54-25, Sanders Trial Tr. 358:6-12). After Jason was convicted, he was sentenced and incarcerated.

The State toxicologist, Justin Sanders, testified the level of Xanax (Alprazolam) was within the therapeutic range if taken for panic attacks. (Doc. 54-25, Sanders Trial Tr. 360:19-21, 381:8-15, 402:5-11). Jason's susceptibility to panic attacks is one of the reasons he was prescribed Xanax. (Doc. 54-6, Purdy Aff. ¶ 2). However, as Plaintiff points out, the state toxicologist testified that the amount of Xanax in Jason's system far exceeded what would be expected according to Jason's prescription. Plaintiff's addiction expert concluded that the level of Xanax in Jason's system was consistent with overmedication and that Jason was "very likely impaired" at the time of the accident. (Doc. 54-25, Sanders Trial Tr. 358:4-15; 394:1-395:9; Doc. 60-6, Martin Expert Report, at 10-11). Jason testified he took extra Xanax immediately after the fatal accident due to his panic. (Doc. 54-4, J. Stewart Dep. 374:20-375:6).

### C.    Settlement of Claims

#### 1.    The Jeff Scott Claim

After the June 27, 2012, accident, Plaintiff paid $420,000 on a separate claim under the 2010 Policy for a serious car accident that occurred on December 13, 2010 (the "Jeff Scott Claim"). Plaintiff handled the Jeff Scott Claim in the ordinary course, and does not seek to recoup the amounts paid on the claim.

21

### 2.  Claims of the Estates of Robert W. Long and Debra Garza

Robert W. Long and Debra Garza's estates gave notice of claims against Defendant, Dennis Stewart, David Bullard, and Ted Deacon.  The estates of Long and Garza included with their notice a draft complaint asserting various causes of action and alleging that Defendant "had direct information, knowledge and written evidence" that Jason was a "known and chronic drug abuser" that "represents a safety risk" in the operation of mobile equipment but that Defendant "turned only a myopic eye toward the glaring problem of Defendant Jason Stewart's unchecked drug abuse."  (*See* Doc. 54-26, Long-Garza Compl. ¶¶ 20, 22).

Defendant's primary carrier, EMC, investigated the circumstances of the accident, never disputed coverage, never reserved rights, and tendered its $1 million policy limits. (Doc. 54-3, EMC Aff. ¶¶ 5-6).  On December 6, 2012, Defendant and Plaintiff entered into an agreement expressly preserving Plaintiff's right to pursue rescission of the 2011 Renewal Policy despite Plaintiff's agreement to participate in and front the funding for the settlement of the underlying claims.  (Doc. 61-1, at 2).  The agreement, executed by Defendant's CEO, states that "no action taken by either [party] in connection with this agreement shall be considered a waiver of any such coverage rights." *Id.*  Plaintiff paid $8,014,704.66 after a negotiation was conducted between Defendant and Plaintiff.  (Doc. 54-2, Bullard Decl. ¶ 17).

## III.  Discussion

Plaintiff's Complaint seeks a declaratory judgment that: (A) rescission is due on the 2011 Renewal Policy because of Defendant's material misrepresentations; or alternatively, (B) recovery under the 2011 Renewal Policy is limited based on the "expected or intended injury" exclusion.  (*See* Doc. 1, at ¶¶ 49-82).  Defendant asserts counterclaims for declaratory judgment that Plaintiff is not entitled to reimbursement on Plaintiff's payments under the 2011 Renewal Policy.  Both parties have filed cross-motions for summary judgment.  (Docs. 52, 55).

Defendant moves for summary judgment on both of Plaintiff's claims, while Plaintiff moves for judgment as a matter of law only on its rescission claim. Nonetheless, as outlined below, there are genuine disputes of material fact that preclude this court from finding either party is entitled to judgment under Rule 56.

### A.      Plaintiff's Rescission Claim

Count One of the Complaint asserts that Plaintiff is entitled to rescind the 2011 Renewal Policy because, during the negotiations for the 2010 Policy and the 2011 Renewal Policy, Defendant misrepresented that Defendant was enforcing the Fleet Safety Manual, when Defendant was in fact excusing Jason Stewart's noncompliance with the Manual's protocols. The court concludes that summary judgment is not appropriate on Plaintiff's rescission claim because the Rule 56 record reveals several genuine disputes of material fact and Plaintiff has not waived its right to seek rescission.

Under Alabama law,[17] there are three grounds for the rescission of a contract:

(a) All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by, or in behalf of, the insured or annuitant shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:

(1) Fraudulent;

(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true

---

[17] It is undisputed that Alabama law governs this issue.  Alabama applies the *lex loci contractus* rule in determining what law governs the interpretation of an insurance policy.  *E.g.*, *Stovall v. Universal Constr. Co., Inc.*, 893 So. 2d 1090, 1102 (Ala. 2004).  The policies were issued to Defendant at its address in Bessemer, Alabama. (Doc. 1, Compl.).  Alabama law therefore applies to the interpretation and application of the policies.

> facts had been made known to the insurer as required either by the application for
> the policy or contract or otherwise.

Ala. Code § 24-14-7(a) (1975).  Here, Plaintiff does not allege fraud.  Rather, Plaintiff seeks

rescission under subsections § 24-14-7(a)(2) and (a)(3), which allow an insurer to rescind or

deny coverage if the insured made misstatements in the negotiations that were material to the

risk *or* affected the insurer's good faith decision to issue the policy for which the insured applied.

*See In re HealthSouth Corp.*, 308 F. Supp. 2d 1253, 1269-70 (N.D. Ala. 2004) (citations

omitted).

Although Defendant argues to the contrary, an insurer, under certain circumstances, may

be entitled to rescind a renewal insurance policy based on misrepresentations which are made

during the negotiations for its original insurance application.  The plain language of Alabama's

statute states that misrepresentations made in "negotiations" for an insurance policy may serve as

the basis for rescission.  *See HealthSouth*, 308 F. Supp. 2d at 1270 ("The statute itself refers to

statements in the application 'or in negotiations therefor,' indicating that statements other than

those contained in the application itself can be the basis for rescission.") (quoting Ala. Code §

27-14-7(a).  Furthermore, a material misrepresentation in negotiations for an insurance policy

can provide the basis for rescission of the renewal policy, particularly when the renewal policy is

based on the original application for insurance.  *See Ex parte Quality Cas. Ins. Co.*, 962 So. 2d

242, 246 (Ala. 2006) ("We find no plausible basis on which to read § 27-14-7 as applicable to an

original policy and not applicable to a renewal policy, when the renewal policy is issued on the

basis of the original application.").  The court now addresses those factual issues which preclude

summary judgment on Plaintiff's rescission claim.

### 1.      Genuine Disputes of Material Fact Preclude Summary Judgment.

To their credit, the parties have agreed on a core set of undisputed facts.  But there remain a number of key facts that are disputed in this case.  The Rule 56 record reveals the following genuine issues of material fact: (1) whether Defendant represented that the Fleet Safety Manual applied to all of Defendant's vehicles, including Jason Stewart's personal passenger vehicle; and (2) whether any misrepresentation that the Manual applied to Jason Stewart was (a) material to the risk insured, or (b) would have caused the insurer in good faith not to issue the policy in the manner that it did.

### (a)      Did Defendant Represent that the Fleet Safety Manual Applied to All of Defendant's Vehicles, Including Jason Stewart's Personal Passenger Vehicle?

A genuine dispute of material fact exists regarding the nature and scope of Defendant's representation to Plaintiff about its Fleet Safety Manual. Plaintiff's assertion of misrepresentation rests squarely on this issue:  In negotiations for either the 2010 Policy or the 2011 Renewal Policy, by affirming that the Fleet Safety Manual was "in force" or "in place," did Defendant misrepresent that it was enforcing the Fleet Safety Manual as to Defendant's personal passenger vehicles, such as Jason Stewart's?

Defendant contends that "[t]here is not substantial evidence in the record to dispute Piggly Wiggly's statement of fact that the Fleet Safety Manual only applied to tractor trailers." (Doc. 64, at 10).  Importantly, however, the critical fact issue presented in this respect is not the *actual* scope of Defendant's application of the Manual; instead, the issue is what Defendant *represented* to Plaintiff, as part of the negotiations regarding the insurance application, about the scope of the Manual's application.[18]   The Rule 56 record contains evidence supporting both

_____

[18] For example, Defendant may have applied the Manual to only to its tractor trailers, but represented to Plaintiff that the Manual applied to all of its vehicles.

sides' arguments, and it is emphatically not the court's place to, in effect, enter the jury room to resolve that dispute at this stage in the litigation.

Defendant argues that the undisputed facts demonstrate that Defendant represented the Manual regulated only to Defendant's tractor trailer drivers. First, Defendant indicates the Fleet Safety Manual's express terms suggest that it could only apply to tractor trailers. (*See* Doc. 53, at 30).[19] However, as Plaintiff contends, at least portions of the Fleet Safety Manual could be read to apply to both private passenger vehicles and tractor trailers.[20] Second, certain

---

[19] Admittedly, the Manual's explicit terms focus in large part on the rules and regulations related to tractor trailers. Specifically, Defendant identifies the following excerpts as precluding the application of the Fleet Safety Manual to non-tractor trailers:

> Maintaining your commercial vehicle operator's license is your responsibility it your responsibility. (Doc. 54-29, Ex. 4 to Tegtman Dep. at 141).

> Driver's Equipment Report Books are assigned to each tractor. Your report book must be with your tractor when it is on the road. (*Id.* at 142).

> A Driver is disqualified under 391.15 of Motor Carrier Safety Regulations if he is convicted or forfeits bond on any of the following charges. (*Id.* at 143).

> Remember, the use of alcohol and/or drugs could result in serious consequences of your career as a *professional* driver. (*Id.* (emphasis added)).

The term "Driver," as referenced herein, is not defined in the fourteen pages of the Manual that Defendant submitted to Plaintiff. Relatedly, Defendant contends that the terms of the Fleet Safety Manual reflect that it regulates only vehicles subject to DOT regulations. Tractor trailers, not private passenger vehicles, are regulated by DOT. Therefore, Defendant suggests, because only Defendant's tractor trailers were subject to DOT regulations, Defendant did not represent the Manual applied to non-DOT regulated vehicles, like Jason Stewart's.

[20] Plaintiff identifies several of the Manual's safety requirements and procedures providing for "universal application":

> It is the responsibility of the driver to maintain a good safety record while an employee of Piggly Wiggly Alabama Distributing Company. (Doc. 54-29, Ex. 4 to Tegtman Dep. at 138).

> Any Piggly Wiggly driver involved in an accident while under the influence of alcohol, narcotics or other illegal drugs will be considered guilty of gross misconduct and subject to immediate discharge. (*Id.* at 140).

> Excessive violations such as speeding, reckless driving, improper lane switches, etc., and/or unsafe operation of equipment such as repeated preventable accidents or a serious chargeable accident will result in disciplinary action up to and including termination. Driving under the influence of alcohol or drugs will result in immediate termination. (*Id.* at 144).

correspondence suggests that *Plaintiff* understood Defendant's "fleet" to be limited to Defendant's tractor trailers.[21]

Plaintiff argues that the same undisputed facts indicate that Defendant represented that its Fleet Safety Manual regulated all of Defendant's vehicles, including Jason Stewart's.  Plaintiff's underwriter for the 2011 Renewal Policy, Hall, states that, based upon by the Manual's plain language, he believed it applied to *all* of Defendant's vehicles — not just tractor trailers.  (Doc. 56-6, Hall Dep. at 115:23-116:16).  Given the context of Defendant's disclosure, it is for a jury to determine the substance and import of Defendant's representation. The court declines the

---

> Any employee who is taking a drug or medication, prescribed by the employee's physician, which may adversely affect that employee's ability to perform work in a safe or productive manner, is required to report such use of medication to his supervisor . . . . The supervisor, in conjunction with the Medical/Personnel Departments, then will determine whether the employee can remain at work, and whether any work restrictions will be necessary.  (*Id.* at 145).

Plaintiff contends that Jason Stewart was exempted from these potentially generally applicable provisions.

[21] For example, during the 2010 underwriting process, four hours after Sica received the Fleet Safety Manual, Sica asked Defendant three questions about the controls applicable to Defendant's private passenger vehicles, like Jason Stewart's.  Specifically, Rosemary Sica asked: "Can you tell me what controls they have for the 55 [private passenger vehicles?] . . .  I assume that the sales force is driving these vehicles."  (Doc. 54-29, Ex. 5 to Tegtman Dep., at 132).  Sica's inquiry included three questions regarding Motor Vehicle Record checks, Personal Use Policies, and driver ages.  (*Id.*).  Defendant argues that this correspondence "proves the underwriter knew the Fleet Safety Manual applied to commercial vehicle operators, not drivers of private passenger vehicles, like Jason Stewart."  (Doc. 64, at 10).  The inference that Defendant draws from the facts may be correct.  (It is certainly reasonable).  However, it is not for the court to act as a jury when dealing with a motion for summary judgment.  Clearly, a competing inference exists: Defendant represented that it had *overlapping* safety protocols for private passenger vehicles — the Fleet Safety Manual (which applied generally to all of Defendant's vehicles) and separate controls (which applied only to those vehicles employees could use personally away from work).

Furthermore, Sica, Plaintiff's underwriter for the 2010 Policy was not deposed in this action.  (*See* Doc. 62, at 8).  Accordingly, the parties could not present information regarding her earlier understanding of Defendant's representation.  Sica's testimony would eliminate much of the parties' speculation on what she believed during the 2010 underwriting process.  Regardless, of course, the court resolves all factual inferences in favor of the nonmovant.

In addition, during the 2011 renewal process, internal correspondence between Plaintiff's broker and underwriter suggests that Plaintiff understood Defendant's "fleet" to include only Defendant's tractor trailers.  Plaintiff's broker first told Hall that it understood he needed certain updated information on Defendant's "fleet."  (Doc. 54-30, Ex. 10 to Tegtman Dep. (emphasis added)).  Fourteen minutes later, Plaintiff's underwriter followed up with Hall suggesting "I just spoke to producer and [premiums] won't change. . . .  Producer monitors *fleet* regularly and still has 93 *tractors* of which 10 sit in terminal and only used for backup purposes."  (Doc. 54-30, Ex. 12 to Tegtman Dep. (emphasis added)).  This correspondence, Defendant argues, suggests it follows that, even in 2011, Plaintiff understood Defendant's "fleet" as consisting of only the 93 tractors.  Again, this may (or may not) be the case.  The jury will tell us.

parties' invitation to draw inferences from the Rule 56 record (which are properly reserved for the trier of fact) in order to resolve the parties' factual disputes. Again, the evidence supports both parties' characterizations of Defendant's representation. The dispute is clearly material. Plaintiff's rescission claim hangs, at least in large part, on its contention that Defendant misrepresented that the Fleet Safety Manual applied to all of Defendant's vehicles and drivers.[22]

For these reasons, the court concludes the parties' dispute over the nature of Defendant's representation regarding the Fleet Safety Manual is both genuine and material. Accordingly, at this stage, judgment as a matter of law for either party is inappropriate.

**(b)     Assuming Defendant Misrepresented that the Manual Applied to Jason Stewart, Was this Misrepresentation Material to the Risk Insured, or Would It Have Caused the Insurer In Good Faith Not to Issue the Policy in the Manner that It Did?**

Defendant argues that even if the court were to assume that Defendant misrepresented that it required Jason Stewart's compliance with its Fleet Safety Manual, summary judgment is still appropriate because the misrepresentation would not have been material or otherwise caused Plaintiff refrain from issuing the policy in the manner that it did. However, for the reasons outlined below, the court concludes both of these issues are better reserved for the trier of fact.

**(i)     Materiality**

Defendant argues that a misrepresentation about the coverage of its Fleet Safety Manual as to any one individual (*e.g.*, Jason Stewart) is immaterial under § 24-14-7(a)(2) as a matter of

---

[22] For example, if Defendant represented that the Fleet Safety Manual applied only to Defendant's fleet of tractor trailers, there would not appear to be an issue regarding any representation about the coverage of Jason Stewart – he did not drive a tractor trailer.

On the other hand, if Defendant represented that the Manual applied to *all* of Defendant's vehicles (including Jason Stewart's), Plaintiff's theory -- that Jason was exempted from the policy and that action was inconsistent with Defendant's representations to Plaintiff -- cuts more ice. In that circumstance, the question is what one makes of Defendant's purported misrepresentation that the Manual was "in force," "in place," or otherwise effective as to all vehicles?

law.  (*See* Doc. 53, at 32-33).   In light of the Rule 56 evidence presented in this case, the materiality of Defendant's alleged misrepresentation is not a question to be resolved by the court on these cross motions for summary judgment.   Some courts have stated that "[t]he question of whether a particular fact is or is not *material* is almost invariably a question for the jury, which is entitled to consider the factual context in which the determination is to be made.   This, of course, includes all of the surrounding circumstances." *State Farm Gen. Ins. Co. v. Oliver*, 658 F. Supp. 1546, 1552 (N.D. Ala. 1987) *aff'd sub nom. State Farm Fire & Cas. Co. v. Oliver*, 854 F.2d 416 (11th Cir. 1988) (discussing Ala. Code § 27-14-7); *see also Bennett v. Mut. of Omaha Ins. Co.*, 976 F.2d 659, 661 (11th Cir. 1992) ("In Alabama, the materiality of a misrepresentation is generally a jury question.") (citation omitted); *State Farm Ins. Co. v. Whiddon*, 515 So. 2d 1266, 1268 (Ala. Civ. App. 1987) ("Alabama courts have consistently held that the issue of whether a particular fact increases the risk of loss assumed by an insurance company -- that is, whether it is material to the insurance coverage -- is generally one for the jury."), citing *Clark v. Ala. Farm Bureau Mut. Cas. Ins. Co.*, 465 So. 2d 1135 (Ala. Civ. App. 1984); *Nat'l Security Ins. Co. v. Tellis*, 104 So. 2d 483 (Ala. App 1958).  This court need not decide if this is an overstatement (or oversimplification) of the rule. Because, here, the facts presented in the Rule 56 record are sufficient to put the issue of materiality to the trier of fact.

Defendant argues that Hall, Plaintiff's 2011 underwriter, testified to the effect that an individual employee's driving record, accident history, and drug test history were not important, relevant, or material to him in underwriting the 2011 Renewal Policy.  (Doc. 56-6, Hall Dep. 154:12-17; 177:6-178:10).  This may be true.  However, the fact that Defendant (at least under one view of the evidence) was excusing Jason Stewart from complying with otherwise generally applicable safety protocols in the Fleet Safety Manual may have been important, relevant, and

material to Plaintiff, a company deciding whether to insure another business for millions of dollars.  Therefore, the materiality of this misrepresentation is a question for the jury.

### (ii)  Good Faith Issuance

In Alabama, and in rescission cases such as this, materiality is not the only issue.  Even were the court to assume that exempting Jason Stewart from compliance with the Fleet Safety Manual was "immaterial" under § 24-14-7(a)(2) as a matter of law, Plaintiff may still be entitled to rescission under § 24-14-7(a)(3).  Under § 24-14-7(a)(3), a plaintiff may recover if he or she can show that:

> The insurer in *good faith* would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

Ala. Code § 27-14-7(a)(3) (emphasis added); *see also HealthSouth*, 308 F. Supp. 2d at 1269-70 (citations omitted).  In *State Farm General Insurance Company v. Oliver*, on a motion for judgment notwithstanding the verdict, the trial court considered the propriety of submitting a question to the jury under § 27-14-7(a)(3).  658 F. Supp. at 1548.  The district court noted that "the crucial words in the statute, 'good faith' . . . describe a fact which is peculiarly suitable for jury determination. . . .  What constitutes or fails to constitute 'good faith,' under these nebulous and undefined circumstances, was a jury question." *Id.* at 1550.[23]  Again, given the conflicting evidence, the court need not decide the breadth of the class of cases that would be subject to a

---

[23] The court ultimately determined that the case should not have been submitted to the jury under § 27-14-7(a)(3) for reasons not directly relevant to this action.  *Id.* at 1552 ("Looking back on it the court should not have submitted any issue under § 27-14-7(a)(3) to the jury . . . .  Everything which the court has said about the evidence bearing on [the insurer-plaintiff's] defense under § 27-14-7(a)(3) is . . . relevant to the defense under § 27-14-7(a)(2).")).

Rule 56 motion. Given this particular Rule 56 record, it is for a jury to decide whether Plaintiff would have issued the policy if it knew of Defendant's alleged misrepresentation.

2.   **Plaintiff's Limited Inquiry into Defendant's Fleet Safety Manual Is Not Dispositive.**

Even assuming that Defendant represented that its Fleet Safety Manual covered all of its vehicles, Defendant contends that it is nevertheless entitled to summary judgment.  Defendant argues that it represented only that the Fleet Safety Manual was "in place," which was a true statement of fact.  According to Defendant, because Plaintiff never asked (and Defendant never made representations) about the Manual's applicability, enforcement, or violations, Defendant cannot be held to a representation that it was evenly applying and enforcing the Manual. (*See* Doc. 57, at 6 n.2). This argument misses the mark.

Generally, an insurance applicant's duty to disclose is constrained by the scope of the insurer's inquiry.  *Allstate Ins. Co. v. Shirah*, 466 So. 2d 940, 944 (Ala. 1985) ("[W]hen parties are intelligent and deal at arm's length, with no confidential relations, there is no duty to disclose when information is not requested and that mere silence will not then constitute fraud." (citations omitted)).  However, in response to any inquiry, the insurer is due a complete and truthful response.  In *Shirah*, the Supreme Court of Alabama stated the general rule regarding the effect of an insurer's inquiry when taking applications for insurance:

> If the insurer propounds questions to the applicant and he makes *full and true* answers, the applicant is not answerable for an omission to mention the existence of other facts about which no inquiry is made of him, although they may turn out to be material for the insurer to know in taking the risk.

466 So. 2d 940, 944 (Ala. 1985) (emphasis added) (quoting 43 Am. Jur. 2d *Insurance* § 1008, 1015 (1982).

Contrary to its argument, what Defendant characterizes as the limited nature of Plaintiff's inquiry into the nuts and bolts of Defendant's Fleet Safety Manual does not necessarily upend Plaintiff's claims.  In this case, the Rule 56 record suggests that Plaintiff's underwriter did not ask questions regarding who the Fleet Safety Manual applied to, whether there had been any violations of the Fleet Safety Manual, or other questions about its enforcement.  (Doc. 54-28, Seigel Dep. 189:24-197:25; *see also* Doc. 54-30, Exs. 10-21 to Tegtman Dep.).  However, for an applicant to represent that it has safety protocols "in force" or "in place" could be viewed by the trier of fact as suggesting, at a minimum, that the applicant is enforcing those protocols.  Without more, Defendant's response also implies that it was uniformly applying those protocols.  It would be clearly misleading if an applicant represented to an insurer that it has safety protocols in effect, while at the same time failing to apply or enforce them.  And, as already discussed above, exactly what Defendant represented is an issue for the jury.

### 3. Plaintiff Has Not Waived Its Right To Rescind the 2011 Renewal Policy.

Defendant also argues that in affirming both the 2010 Policy and the 2011 Renewal Policy "with knowledge of the alleged misrepresentation," Plaintiff waived its right to rescind the 2011 Policy.  Defendant contends the waiver occurred when, after the June 27, 2012 accident, Plaintiff (1) paid $420,000 under the 2010 Policy on the Jeff Scott Claim for the car wreck that occurred on December 13, 2010, and (2) accepted the premium payment for the 2012 Renewal Policy.  Plaintiff counters that it protected its right to seek rescission against any claim of waiver.  Plaintiff has the better of this particular argument.

For decades, the Supreme Court of Alabama has recognized that the substance of the waiver doctrine's application in the area of insurance law is that "if the insurer, with knowledge of facts which would bar an existing primary liability, recognizes such primary liability by

treating the policy as in force, he will not thereafter be allowed to plead such facts to avoid his primary liability." *Protective Life Ins. Co. v. Cole*, 161 So. 818, 819 (Ala. 1935) (citations omitted). Thus, "when an insurer has knowledge of a fact or situation that it could use to invoke a provision of its policy that would render the policy void and worthless, but nonetheless continues to accept premium payments from its insured, it will be considered to have waived that provision and will be estopped from using that provision to deny a claim." *Ex parte Ikner*, 682 So. 2d 8, 10 (Ala. 1996). Nevertheless, importantly, waiver is a "*voluntary* surrender or relinquishment of some known right, benefit, or advantage." *Stewart v. Bradley*, 15 So. 2d 533, 543 (Ala. Civ. App. 2008) (emphasis added). A party "cannot be charged with a waiver where the party does not have, at the time of the alleged waiver, knowledge of all material facts upon which the alleged waiver depends." *Putnam Constr. & Realty Co., Inc. v. Byrd*, 632 So. 2d 961, 964 (Ala. 1992).

In this case, Defendant has not identified any manifestation of Plaintiff's intent to voluntarily surrender its right to seek rescission of the 2011 Renewal Policy. To the contrary, the Rule 56 evidence indicates that Plaintiff advised Defendant of its basis to seek rescission, but agreed to work cooperatively with Defendant to resolve the underlying claims prior to litigating the coverage dispute. On December 6, 2012, the parties entered into an agreement expressly preserving Plaintiff's right to pursue rescission of the 2011 Renewal Policy despite Plaintiff's agreement to participate in (and front the funding for) the settlement of the underlying claims. (Doc. 61-1, at 2). The agreement, executed by Defendant's CEO, states that "no action taken by either [party] in connection with this agreement shall be considered a waiver of any such coverage rights." *Id.* In light of this agreement, the court cannot say that Plaintiff has ever voluntarily waived its right to rescission under the 2011 Renewal Policy.

Moreover, both of Defendant's reasons for waiver fail as a matter of law. Plaintiff's acceptance of a premium for the 2012 Renewal Policy does not evidence a voluntary waiver of its ability to rescind the earlier 2011 Renewal Policy. Under Alabama law, Plaintiff believed (as best the court can tell, in good faith) that it could not have nonrenewed the policy under Alabama insurance regulations. The June 27, 2012, accident occurred 35 days before the expiration date of the 2011 Renewal Policy. By the time Plaintiff's underwriting department was notified of the accident, it was beyond the period required to give notice of nonrenewal of such a policy under the Alabama regulations. (Doc. 54-29, Tegtman Dep. 291:22-292:13). Although Plaintiff renewed the umbrella coverage for the 2012-2013 term, Plaintiff also notified Defendant that it would not renew for the 2013-2014 policy period. (Doc. 56-6, Hall Dep. 247:2-6). Plaintiff's conduct in renewing the 2012 Renewal Policy does not indicate any knowing or voluntary waiver of its right to rescind the 2011 Renewal Policy.

Similarly, that Plaintiff made payment on the Jeff Scott Claim under the 2010 Policy is irrelevant to the current action. At the time Plaintiff issued the 2010 Policy, Plaintiff did not have knowledge of the facts giving rise to its current rescission claim (most of those events occurred *after* the 2010 Policy was issued). In addition, Jeff Scott's accident occurred on December 13, 2010, before Plaintiff had notice of Defendant and Jason Stewart's conduct at issue in this case. Plaintiff handled the Jeff Scott Claim in the ordinary course, and has not sought to rescind the 2010 Policy or recoup the amounts paid on the Jeff Scott Claim. Under these circumstances, an insurer should not be penalized for not seeking rescission of a prior policy or refusing to pay a claim under that earlier policy. For these reasons, the court concludes that Plaintiff has not waived its right to rescind the 2011 Renewal Policy.

**4.     Plaintiff Is Not Required to Establish a Knowing, Intentional, or Willful Misrepresentation to be Entitled to Rescind the 2011 Policy.**

Section 27-14-7(a) allows rescission in cases of innocent misrepresentations; however, insurers can, through policy language they utilize or the policy application they adopt, raise the standard of proof for rescission to (1) a knowing or intentional (2) misrepresentation or concealment.   *See Oliver*, 854 F.2d at 418-20; *Healthsouth*, 308 F. Supp. 2d at 1270, 1286. Here, Defendant argues that the language of Plaintiff's umbrella application ("ACORD Form 131"[24]) contractually limited Plaintiff's right to rescind to only those instances where Defendant "knowingly and with intent to defraud" or "willfully" made a misstatement or concealed information. (Doc. 54-29, Exs. 4, 12 to Tegtman Dep.).   Therefore, Defendant argues, to rescind the 2011 Policy, Plaintiff would have to show that Defendant knowingly, willfully, and with the intent to deceive made a misstatement or concealed information regarding Jason Stewart's exemption from the Fleet Safety Manual. But Defendant's argument incorrectly assumes that the language in Plaintiff's ACORD Form 131 raises the standard of proof under section 27-14-7(a). It does not.

ACORD Form 131 contains the following disclaimer:

Any person who knowingly and with intent to defraud any insurance company or another person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading information concerning any fact material thereto, commits a fraudulent insurance act which is a crime and subjects the person to criminal and . . . civil penalties.

(Doc. 54-29, Ex. 4 to Tegtman Dep., at 125) (emphasis omitted).   The plain language of ACORD Form 131 does nothing more than advise the insured of potential consequences of intentional insurance fraud.   Without more, a simple warning and disclaimer stating that an insured may be

---

[24] ACORD Form 131 is the only insurance application form Plaintiff requires for the issuance of umbrella coverage.   (Doc. 54-27, Hall Dep. 161:6-16; 185:10-15).   It is undisputed there is no misrepresentation in the application itself. (*See id.* at 185:16-19; 220:1-22; Doc. 54-28, Seigel Dep. 87:5-91:2, 93:9-12, 97:12-16, 152:12-16, 153:5-9; Doc. 54-29, Tegtman Dep. 344:9-20).

subject to criminal and civil penalties for intentional insurance fraud does not alter or in any way heighten the statutory standard for rescission.

###    B.    Exclusion of Expected or Intended Injuries

In Count Two of its Complaint (Doc. 1), Plaintiff contends (in the alternative) that even if it is not entitled to rescission, under the 2011 Renewal Policy's "expected or intended injury" exclusion, Plaintiff had no duty to pay Defendant any insurance proceeds based on the June 27, 2012, accident.  (Doc. 1, Compl. at ¶ 71).  Section 1, Paragraph 2 of the 2011 Renewal Policy excludes insurance coverage for " 'bodily injury' . . . expected or intended from the standpoint of the insured."  (Doc. 1-1, at 9).  Plaintiff "does not assert that [Defendant] 'intended' the injuries sustained in the June 27, 2012 accident."  (Doc. 59, at 18).  Instead, Plaintiff argues, the evidence reflects that Defendant " 'expected' the injuries to occur based on its long-standing knowledge of Jason's drug abuse, unsafe conduct at work and his proclivity to get into preventable accidents in a company vehicle," as a matter of fact.  (*Id.*).  According to Defendant, summary judgment is due on Plaintiff's claim because Jason Stewart's driving record, controlled substance history, accident history, and work performance are not disputed.  The court disagrees.

In Alabama, "a subjective standard determines whether the 'expected or intended' exclusion applies — that is, whether an insured 'expected or intended' to inflict 'bodily injury or property damage.' " *State Farm Fire & Cas. Co. v. Chestang*, 952 So. 2d 1101, 1104-05 (Ala. 2006), quoting *Ala. Farm Bureau Mut. Cas. Ins. Co. v. Dyer*, 454 So. 2d 921, 925 (Ala. 1984).

> Under this subjective test, an injury is "intended from the standpoint of the insured" if the insured possessed the specific intent to cause bodily injury to another, whereas an injury is "expected from the standpoint of the insured" if the insured subjectively possessed a high degree of certainty that bodily injury to another would result from his or her act.

*Dyer*, 454 So. 2d at 925.  The language of the "expected or intended" exclusion at issue here focuses on the subjective state of mind of the insured — that is, it states that the policy provides

no coverage for bodily injury "which is either *expected or intended from the standpoint of the insured.*" (Doc. 1-1, at 9) (emphasis added). Alabama courts have observed that the inclusion of the phrase "from the standpoint of the insured" in the policy's exclusion makes it even clearer that a subjective standard determines whether the exclusion is applicable. *See Chestang*, 952 So. 2d at 1106 & n.5 (commenting on identical language found in the policy at issue in *Dyer*, 454 So.2d at 925).

Ultimately, whether an injury that the insured inflicts upon another person is "expected or intended" is a question for the trier of fact.[25] *See White v. Maryland Cas. Co.*, 589 So. 2d 1294, 1295 (Ala. 1991), citing *Dyer*, 454 So. 2d at 925; *Boyd v. Great Central Ins. Co.*, 401 So. 2d 19 (Ala. 1981); *Smith v. N. River Ins. Co.*, 360 So. 2d 313 (Ala. 1978). Whether an insured "expected or intended" an injury or damage is "inferred from the surrounding circumstances." *See White*, 589 So. 2d at 1297. Therefore, the factfinder must be presented with all the evidence pertaining to the incident in question (*i.e.*, the surrounding circumstances) in order to evaluate the credibility of the testimony and determine whether the insured expected or intended the injury to result.

In nearly all of the cases where an "expected or intended" injury argument has been presented, Alabama courts have determined the disposition of that issue was not suited to a summary judgment analysis. *See, e.g.*, *White*, 589 So. 2d at 1295; *see, e.g.*, *Chestang*, 952 So. 2d at 1105 (reversing and remanding fact issue as to whether the expected or intended exclusion applied); *Calhoun Cnty. Econ. Dev. Council v. Nat'l Sec. Fire & Cas. Co.*, 808 So. 2d 24, 26

---

[25] Contrary to Defendant's characterization of the legal standard, Plaintiff need not demonstrate that Defendant "had a high degree of certainty Jason Stewart was going to kill Robert Long and Debra Garza when Stewart left work to go home on June 27, 2012." Instead, as discussed above, Alabama law merely requires that "the insured subjectively possessed a high degree of certainty that *bodily injury to another would result from his or her act*." *Dyer*, 454 So. 2d at 925 (Ala. 1984). Therefore, in this case, Plaintiff must demonstrate to a jury that Defendant subjectively possessed a high degree of certainty that bodily injury would result from providing Jason Stewart with a company car.

(Ala. 2001) (whether insured expected damage "would depend on the factfinder's assessment of the evidence about the knowledge and motivation" of insured); *Watson v. Ala. Farm Bureau Mut. Cas. Ins. Co.*, 465 So. 2d 394 (Ala. 1985) (affirming trial court's findings on controverted factual question of whether insured expected or intended injury to result); *Smith*, 360 So. 2d at 316 (upholding jury verdict and confirming whether injury was expected or intended by insured is a question for jury). In fact, Defendant identifies only one Alabama case in which the court has permitted summary judgment in favor of the insured on a question of "expected or intended" injury. *Capitol Alliance Ins. Co. v. Thorough-Clean, Inc.*, 639 So. 2d 1349 (Ala. 1994).

In *Thorough-Clean, Inc.*, the Supreme Court of Alabama affirmed a trial court's ruling that an expected or intended injury did not exclude coverage where there was simply "no evidence in the record" to support the insurer's argument that the insured expected or intended the bodily injury that resulted in the underlying suit. 639 So. 2d at 1349. There the violation of company policy involved the hiring of a formerly incarcerated applicant — the office manager of the insured janitorial service hired her son as a janitor. *Id.* The office manager knew that her son had served time in jail for a violent crime but did not tell anyone else at the insured company. *Id.* While the son was on duty, he allegedly raped and robbed a woman. *Id.* The victim sued the insured for negligent hiring and supervision. *Id.* In a subsequent coverage action, the trial court concluded that the expected or intended exclusion did not bar coverage because the insured did not subjectively possess a high degree of certainty that the injury would occur. *Id.*

*Thorough-Clean* is distinguishable from these facts. In *Thorough-Clean*, management (other than his mother, the office manager who hired her son) was not aware of the janitor's history of violent crime and incarceration, and that history was concealed from his application. *Id.* at 1350, 1352. In this case, the Rule 56 record permits at least an inference of broader

38

corporate knowledge of Jason's drug abuse and reckless driving habits than that involved in *Thorough-Clean*. At a minimum, there is substantial Rule 56 evidence that the CEO (his father), the Human Resources Director, upper management, and the company nurse were all aware of danger posed by Jason Stewart's employment.[26]

In this case, the court is neither competent nor authorized to make the credibility determinations necessary to resolve the parties' dispute of fact. Therefore, on the Rule 56 record, Plaintiff has clearly created a genuine issue of material fact. The question of whether Defendant "expected" the injury resulting from the June 27, 2012 wreck should be decided by a jury under a totality of the circumstances analysis. Accordingly, Defendant's motion for summary judgment on Plaintiff's Count Two must also be denied.

---

[26] The parties have presented evidence that is susceptible to conflicting inferences; therefore, whether Defendant expected the injury in this case is a question of fact. Plaintiff has offered evidence suggesting that, at various times, Defendant knew of Jason's drug use and tolerated his impairment at work. Plaintiff offers accounts from Hershel Farr (worked in Defendant's Buildings and Grounds department, reporting directly to Jason), Jimmy Weston (employee working in maintenance department), Jimmy Smith (foreman of Defendant's forklift shop), Paul Rivers (supervisor in Defendant's forklift shop), Carol Dawson (Dennis Stewart's assistant), Kenneth Rudolph (former temporary worker in Jason's department), Gregory Chaviest (former temporary worker under Jason), and Robert Lewis Scott, Jr. (former temporary worker), each tending to show Jason had a history of questionable work conduct. (*See* Doc. 55-1, at 15-18). In addition, Plaintiff points to other evidence showing that: Dennis Stewart may have been "doling out" Jason's medicine from his office in an attempt to control his son's drug use (*see* Doc. 56-10, Deacon Dep. 110:19-2; Doc. 56-13, Bullard Dep. 300:9-301:11); Defendant ignored Dr. Romeo's opinion that Jason's operation of his company vehicle represented a safety risk (*see* Doc. 56-25, Dr. Romeo Letter, at 2); and Defendant saw incidents where Jason was engaged in hazardous work behavior, but took no action (*see* Doc. 56-13, Bullard Dep. 362:21-364:6). Moreover, in its attempt to deconstruct Defendant's argument, Plaintiff attacks the credibility of each of Defendant's proffered witnesses. Defendant offers testimony from a number of witnesses stating they did not "expect" the accident. Plaintiff has categorized the witnesses as follows: (1) current employees for Defendant, including those at the management level who would be directly responsible for allowing an impaired employee to operate a company vehicle; (2) doctors that treated Jason and prescribed him the medications he was under the influence of at the time of his accident (and which resulted in his conviction for homicide while under the influence); and (3) the state trooper who spoke with Jason approximately 15 minutes before the fatal June 27, 2012 accident and let him back on the road. According to Plaintiff, each category of witness has obvious self-serving reasons for testifying that Jason Stewart's accident was completely unexpected.

**IV.     Conclusion**

For the foregoing reasons, both Defendant and Plaintiff's motions for summary judgment (Docs. 52, 55) are due to be denied.  In addition, Defendant's Objection and Motion to Exclude (Doc. 66) is moot.

A separate order will be entered.

**DONE** and **ORDERED** this July 20, 2015.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE